PD-0173-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 3/19/2015 7:17:07 PM
Accepted 3/20/2015 8:55:59 AM
ABEL ACOSTA
CLERK

CASE NO. PD-0173-15

In the Court of Criminal Appeals
Austin, Texas

GORDON RAY LEWIS

Petitioner

V.

STATE OF TEXAS

Respondent

Appealed from the Second Court of Appeals
Fort Worth, Texas

Court of Appeals Cause No. 02-13-00367-CR

---

## PETITION FOR DISCRETIONARY REVIEW

---

FILED IN
COURT OF CRIMINAL APPEALS

March 20, 2015

ABEL ACOSTA, CLERK

MICHAEL W. MINTON
State Bar No. 14194550

THE LAW OFFICES OF
MICHAEL W. MINTON, P.L.L.C.
6100 Western Place, Suite W0541
Fort Worth, Texas 76107
mminton@mintonlaw.com
Telephone: 817-377-9200
Facsimile:  817-377-9201

**ORAL ARGUMENT REQUESTED**

## IDENTITY OF THE PARTIES AND COUNSEL

**Petitioner**

**Gordon Ray Lewis**

**Petitioner Counsel**

MICHAEL W. MINTON
State Bar No. 14194550

The Law Offices of
Michael W. Minton, PLLC
6100 Western Place, Suite W0541
Fort Worth, Texas 76107
Telephone: 817-377-9200
Facsimile:  817-377-9201

**Trial Counsel**

RICHARD MITCHELL
State Bar No. 24047319

Law Offices of Richard Mitchell
211 S. Rusk Street
Weatherford, Texas 76086
Telephone: 817-594-1088
Facsimile: 817-585-4778

**Respondent**

**The State of Texas**

**Respondent/Trial Counsel**

ROB CHRISTIAN
State Bar No. 00798106

Hood County District Attorney
1200 W. Pearl Street
Granbury, Texas 76048
Telephone: 817-579-3245
Facsimile:  817-579-3247

**Trial Court Judge**

Hon. Ralph H. Walton, Jr.
355th Judicial District Court
1200 W. Pearl Street
Granbury, Texas 76048

Telephone: 817-579-3233
Facsimile:  817-579-3243

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL i

TABLE OF CONTENTS ii

TABLE OF AUTHORITIES iv

STATEMENT REGARDING ORAL ARGUMENT 2

STATEMENT OF THE CASE 2

STATEMENT OF PROCEDURAL HISTORY 2

QUESTIONS FOR REVIEW 3

ARGUMENT 4

    I.     The failure to recuse Judge Walton requires a new trial 4

    II.     Under this Court's opinion in *Sexton v. State*, tool mark identification evidence from the state's witness should have been excluded, requiring a new trial 9

CONCLUSION AND PRAYER 15

CERTIFICATE OF SERVICE 16

CERTIFICATE OF COMPLIANCE 17

APPENDIX

# TABLE OF AUTHORITIES

**CASE** **PAGE**

*Abdygapparva v. State,*
        243 S.W.3d 191 (Tex. App. – San Antonio
        2007, pet. ref'd.)                                                    5

*Adams v. State,*
        2015 WL 505143 (Tex. App. – Fort Worth Feb. 5, 2015,
        pet. disc. rev. filed March 18, 2015)                                 5

*Cantu v. State,*
        842 S.W.2d 776 (Tex. Crim. App. 1992)                                 10

*Caperton v. A.T. Massey Coal Co., Inc.,*
        566 U.S. 868 (2009)                                                   4

*Coble v. State,*
        330 S.W.3d 253 (Tex. Crim. App. 2010)                                 12

*Ex parte Ellis,*
        275 S.W.3d 109 (Tex. App. – Austin 2008, no pet.)                     7

*Litekey v. U.S.,*
        510 U.S. 540 (1994)                                                   4, 7

*Marshall v. Jericho, Inc.,*
        446 U.S. 238 (1980)                                                   4

*McCullough v. Kitzman,*
        50 S.W.3d 87 (Tex. App. – Waco 2001, pet. denied)                     5

*McKinney v. State,*
        177 S.W.3d 186 (Tex. App. Houston [1st Dist.]
        2005) *aff'd*                                                         10

*Metzger v. Sebic,*
        892 S.W.2d 20 (Tex. App. – Houston [1st Dist.]
        1994, writ denied)                                                    4

*Montgomery v. State,*
    810 S.W.2d 372 (Tex. Crim. App. 1990)      10

*Nichols v. Alley,*
    71 F3d 347 (10th Cir. 1995)      8

*Ramey v. State,*
    2009 WL 335276 (Tex. Crim. App. 2009)      15

*Rymer v. Lewis,*
    206 S.W.3d 732 (Tex. App., Dallas no pet.)      4

*Sexton v. State,*
    93 S.W.3d 96 (Tex. Crim. App. 2002)      9, 10, 11, 15

*State of Texas ex rel. Vance v. Clawson,*
    465 S.W.2d 164 (Tex. Crim. App. 1971)      10

*State v. Addington,*
    588 S.W.2d 569 (Tex. 1979)      11

*Turner v. State,*
    953 N.E.2d 1039 (Ind. 2011)      11

*U.S. v. Monteiro,*
    407 F.Supp.2d 351 (D. Mass. 2006)      12

*Weatherred v. State,*
    15 S.W.3d 540 (Tex. Crim. App. 2000)      10

*Webbe v. McGhie Land Title Co.,*
    549 F.2d 1358 (10th Cir. 1977)      6

*Whitehead v. State,*
    273 S.W.3d (Tex. Crim. App. 2008)      6, 7

*Zarychta v. State,*
    44 S.W.3d 155 (Tex. App. – Houston [14th Dist.]
    2001, pet. ref'd)      10

**STATUTES**

Tex. R. Civ. P. 18(b)(1) ............................................ 4

CASE NO. PD-0173-15

In the Court of Criminal Appeals
Austin, Texas

GORDON RAY LEWIS

Petitioner

V.

STATE OF TEXAS

Respondent

Appealed from the Second Court of Appeals
Fort Worth, Texas

Court of Appeals Cause No. 02-13-00367-CR

---

## PETITION FOR DISCRETIONARY REVIEW

---

TO THE HONORABLE COURT OF CRIMINAL APPEALS:

NOW COMES Gordon Ray Lewis, petitioner, who makes and files his petition for discretionary review, and in support thereof would respectfully show:

**STATEMENT REGARDING ORAL ARGUMENT**

Petitioner requests oral argument in this matter. In part, this case deals with whether Lewis is entitled to recusal of the trial court judge under TEX. R. CIV. P. 18b because Lewis' mother, a key alibi witness at his trial, had been previously convicted of felony retaliation against Judge Ralph Walton, Jr. the trial court judge presiding over Lewis' trial, arising out of the fact of Lewis' indictment.

**STATEMENT OF THE CASE**

Gordon Ray Lewis was charged with the capital murder of Gene Sabin that occurred on January 17, 2012. On June 28, 2013, he was found guilty of capital murder and sentenced to life in prison in the institutional division of the Texas Department of Criminal Justice.

**STATEMENT OF PROCEDURAL HISTORY**

The court of appeals issued its opinion and judgment affirming Lewis' conviction on December 18, 2014. *Lewis v. State*, cause no. 02-12-00367-CR, 2014 WL 7204708 (Tex. App. – Fort Worth 2014) (not designated for publication). A motion for extension of time in which to file his motion for rehearing was filed by Lewis on January 2, 2015 and was granted by order

dated January 12, 2015. Lewis' motion for rehearing was then filed January 9, 2015 and was denied by the court by order dated January 15, 2015.

## QUESTIONS FOR REVIEW

1. **A fair trial in a fair tribunal is a basic requirement of due process. Moreover, under TEX. R. CIV. P. 18b(b)(1), a judge "must recuse in any proceeding in which…the judge's impartiality *might* reasonably be questioned." (Emphasis added). In this case, Lewis' motion to recuse Judge Walton was denied even though Lewis' mother was convicted of retaliation by threat against several public officials, including Judge Walton, for statements made after her son's indictment, and she testified as an alibi witness for the defense at his trial after she was convicted. Under these circumstances, is Lewis entitled to a new trial before a different judge?**

2. **In *Sexton v. State*, 93 S.W.3d 96 (Tex. Crim. App. 2002) this Court held that testimony regarding markings on cartridge cases was unreliable under the circumstances, including the fact that the magazine making the marks was unavailable. In this case, the state's witness essentially testified to the same foundation for his testimony as *Sexton* and the state never offered articles supporting his opinions into evidence nor were they otherwise included as part of the record. Under these circumstances, did the trial court commit harmful error by allowing testimony about cartridge case markings by a forensic examiner that in essence were no different from the testimony disallowed in *Sexton*?**

# ARGUMENT

## I.    The failure to recuse Judge Walton requires a new trial.

In *Caperton v. A.T. Massey Coal Co., Inc.*, the United States Supreme Court held that "[i]t is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process."[1]  The due process clauses of the Texas and United States Constitution both guarantee an impartial and disinterested tribunal.[2]

TEX. R. CIV. P. 18b(b)(1), requires that a judge "must recuse in any proceeding in which…the judge's impartiality might reasonably be questioned."[3]    As the supreme court has noted under the federal counterpart containing identical language "what matters is not the reality of bias or prejudice but its appearance."[4]

The issue of recusal in this case arises under unique circumstances which appear to have no direct precedent under Texas law.  That direct precedent does not exist, however, does not preclude recusal based on the underlying policies Rule 18b was intended to promote. For this reason,

---

[1] 556 U.S. 868, 876 (2009), quoting *In re Murchison*, 349 U.S. 133 (1955).

[2] *Marshall v. Jericho, Inc.*, 446 U.S. 238, 242 (1980); *Metzger v. Sebic*, 892 S.W.2d 20, 37-38 (Tex. App. – Houston [1st Dist.] 1994, writ denied); *Rymer v. Lewis*, 206 S.W.3d 732, 736 (Tex. App, Dallas, no pet.).

[3] TEX. R. CIV. P. 18b(b)(1).

[4] *Litekey v. U.S.*, 510 U.S. 540, 548 (1994).

determination of whether recusal is necessary must necessarily be made on a fact intensive, case by case basis.[5]

Karen Adams, Lewis' mother, was convicted of three counts of retaliation and given a six year sentence in each case because of threats allegedly made after Lewis was indicted.[6] One of these threats was against Judge Walton.[7] In this case, Lewis was tried before the same judge for whom his mother was previously convicted of threatening to kill because Lewis was indicted for murder.

The question presented here is simple: should Judge Walton have been recused under the circumstances because his impartiality might reasonably be questioned? The answer does not turn on whether Judge Walton harbored or displayed any actual animus or bias toward Lewis or his mother. Simply put, the rule-imposed standard—whether Judge Walton's impartiality "might reasonably be questioned"—means that the

---

[5] *McCullough v. Kitzman*, 50 S.W.3d 87, 89 (Tex. App. – Waco 2001, pet. denied); *Abdygapparva v. State*, 243 S.W.3d 191, 198 (Tex. App. – San Antonio 2007, pet. ref'd).

[6] *Adams v. State*, 2015 WL 505143 (Tex. App.-Fort Worth, Feb. 5, 2015, pet. disc. rev. filed March 18, 2015)(not designated for publication). The cause number assigned to her petition is PD-0293-15.

[7] *Adams*, 2015 WL 505143 at *1.

mere appearance of impartiality is virtually as important as the fact of impartiality.[8]

The case coming closest to the facts of the one at bar is this Court's opinion in *Whitehead v. State*.[9] Admittedly, the case is not completely on all fours with the unique situation presented here but it is sufficiently analogous and involves the same important policy considerations to be controlling.

Whitehead pleaded guilty to indecency with a child and the trial court sentenced him to four years confinement but suspended the sentence and placed him on community supervision for four years. Subsequently, the court granted a motion by the state and revoked Whitehead's community supervision.[10]

While in jail awaiting transport to prison, Whitehead wrote a letter to his girlfriend in which he wrote "I live to get out and kill [the trial court judge], Mrs. Keith [his therapist] and Tucker [his probation officer], and their families and pets, and rape their women and children in front of

---

[8] *Webbe v. McGhie Land Title Co.*, 549 F.2d 1358, 1361 (10th Cir. 1977).

[9] 273 S.W.3d 285 (Tex. Crim. App. 2008).

[10] 273 S.W.3d at 285-286.

them."[11]  Not surprisingly, this unprivileged communication was read and its contents communicated to the authorities.

Whitehead was indicted for retaliation against the probation officer and tried before the same judge who revoked his community supervision and who was threatened with death in the letter.[12]  This Court held that the trial judge was clearly disqualified under the circumstances because he was a "victim" of the defendant for purposes of disqualification even though he was not named as a victim in the indictment.

The court of appeals held that recusal is only warranted when a judge displays an "attitude or state of mind so resistant to fair and dispassionate inquiry" as to cause a reasonable member of the public to question the objective nature of the judge's rulings, citing *Ex parte Ellis*.[13]  But *Ellis* in turn relied on *Liteky v. U.S.*[14] where the basis of recusal was the trial court judge's remarks, conduct and attitude towards some of the same defendants in a previous proceeding, factors not in play here.

---

[11] 273 S.W.3d at 295-286.

[12] *Id.*

[13]  275 S.W.3d 109 (Tex. App.-Austin 2008, no pet.).

[14] 510 U.S. 540 (1994).

Instead, this case is more akin to *Nichols v. Alley.*[15]  In that case Terry Nichols, part of the Oklahoma City bombing plot along with Timothy McVeigh, sought and obtained a writ of mandamus from the Tenth Circuit to recuse Judge Wayne Alley from presiding over his criminal trial.  Judge Alley's courtroom was located in the Alfred P. Murragh Federal Building in Oklahoma City.  The bomb blast caused extensive damage to the judge's courtroom, injured a member of his staff, killed 169 people, injured many others, and caused massive property damage.[16]

Even though the facts in this case are vastly different both in nature and scope from those involved in *Nichols*, one important principle from that case is applicable here:  under the nearly identically worded federal counterpart to Rule 18b the court recognized that "the judge's actual state of mind, purity of heart, incorruptibility, or lack of partiality are not the issue."[17]

In this case, Lewis' mother was convicted—found guilty beyond a reasonable doubt—of threatening to harm Judge Walton, among others.  Moreover, she testified as an alibi witness on behalf of her son in a trial

---

[15] 71 F.3d 347 (10th Cir. 1995).

[16] 71 F.3d at 349.

[17] 71 F.3d at 351.

presided over by Judge Walton.[18]  Applying the proper legal standard of whether a reasonable person—an informed member of the public at large rather than a lawyer or a judge—would have reason to doubt Judge Walton's impartiality,  the Court should grant Lewis' petition to determine whether these circumstances mandated recusal.

**II.    Under this Court's opinion in *Sexton v. State*, tool mark identification evidence from the state's witness should have been excluded, requiring a new trial.**

In *Sexton v. State* this Court held that the use of magazine marks to connect items found at the crime scene with items found in a defendant's apartment was unreliable where, among other things, the magazines making the tool marks on fired and unfired cartridges were not found by the police and were therefore not available to make test marks for comparison.[19]  Yet in this case the court of appeals held that the evidence of the state's firearms expert was admissible even though articles offered by the Court were not admitted into evidence as part of the Court's record and neither the murder weapon nor the magazine making the marks were recovered.

---

[18] Slip opinion, p. 13.

[19] 93 S.W.3d 99 (Tex. Crim. App. 2002).

The trial court's decision to admit the evidence in this case is reviewed under an abuse of discretion standard of review.[20]  A trial court abuses its discretion when it makes a decision "so clearly wrong as to be outside that zone within which reasonable persons might disagree."[21]

The scope of review, however, for abuse of discretion in a criminal case is whether the trial court acted without reference to any guiding rules and principles, or in other words, whether the trial court acted arbitrarily or unreasonably.[22]  Guiding rules and principles necessarily includes this Court's holding in *Sexton* since the courts of appeal are bound by this Court's precedents.[23]

---

[20] *Sexton v. State*, 93 S.W.3d 96, 99 (Tex. Crim. App. 2002); *see also Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).

[21] *Cantu v. State*, 842 S.W.2d 776, 782 (Tex. Crim. App. 1992).

[22] *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990) (en banc).

[23] *See State of Texas ex rel. Vance v. Clawson,* 465 S.W.2d 164, 168 (Tex.Crim.App.1971) ("The Court of Criminal Appeals is the court of last resort in this state in criminal matters. This being so, no other court of this state has authority to overrule or circumvent its decisions, or disobey its mandates."); *Zarychta v. State,* 44 S.W.3d 155, 162 (Tex. App.-Houston [14th Dist.] 2001, pet. ref'd) ("[A]s an intermediate appellate court, we are bound by controlling authority from the Court of Criminal Appeals."); *McKinney v. State,* 177 S.W.3d 186, 192 (Tex. App.-Houston [1st Dist.] 2005),*aff'd,* 207 S.W.3d 366 (Tex.Crim.App.2006) (stating that an intermediate appellate court must follow binding precedent of the Court of Criminal Appeals).

Additionally, it was the state's burden to establish admissibility by clear and convincing evidence.[24]  In the context of a criminal case, "clear and convincing evidence" means that measure of degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.[25]  As our supreme court has pointed out, this is an intermediate standard falling between preponderance of the evidence and the reasonable standard in criminal proceedings.[26]

Applying the appropriate scope of review and the standard for clear and convincing evidence, it becomes immediately apparent that the court of appeals wrongly ignored *Sexton* in affirming Lewis' conviction.

First and foremost, since *Sexton* counsel for Lewis has been unable to find another Texas case other than the instant case in which an appellate court has admitted tool mark identification testimony in the absence of a weapon or magazine for comparison.[27]

---

[24] *Sexton*, 93 S.W.3d at 100.

[25] *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979).

[26] *Id.*

[27] Other jurisdictions have addressed the issue where *Sexton* has been cited by the defendant.  In *Turner v. State*, 953 N.E.2d 1039 (Ind. 2011), the Supreme Court of Indiana expressly declined to follow *Sexton* and allowed toolmark testimony in the absence of the firearm or magazine.  953 N.E.2d at 1052.  The court acknowledged that this Court in *Sexton* "rigorously applied" the federal *Daubert* standard, which it

Second, the court of appeals' reasons for refusing to apply *Sexton* are unpersuasive.  The state's expert, Jeffress, had never testified about toolmarks from magazines before,[28] yet the court of appeals deemed him qualified because he had done this specific type of identification in "at least five cases."  But the testimony does not establish whether these cases involved testing where the tool-making item (the magazine) was unavailable.  And the court also relied on Jeffress' testimony that having the murder weapon does not result in a better probability that conclusions from comparison are correct.  But this statement is at best ambiguous since it is not the *murder weapon* that is significant but the availability of the *magazine* that is significant since the murder weapon could conceivably be recovered with a magazine in it other than the magazine in the weapon when the killing occurred.   Moreover, this statement is nothing more than the conclusory ipse dixit—"because I say so"—by the witness which this Court has recognized as meaningless in the context of expert opinions.[29]

considered instructive but not binding under Indiana law.  *Id.* The court also seized on the expert's hyperbole that the procedure was one hundred percent accurate.  *Id. Cf. U.S. v. Monteiro*, 407 F.Supp.2d 351, 364 (D. Mass. 2006)(citing *Sexton* as an example of "storm clouds" gathering to question reliability of toolmark identification).

[28] Slip opinion, p. 20.

[29] *Coble v. State*, 330 S.W.3d 253, 278 f.n. 62 (Tex. Crim. App. 2010), citing  *Burrow v. Arce,* 997 S.W.2d 229, 235 (Tex.1999) ( "Although expert opinion testimony often provides valuable evidence in a case, 'it is the basis of the witness's opinion, and not the

Third, Jeffress' testimony is internally inconsistent. The court of appeals quoted his testimony that firearm toolmark experts look for reproducible patterns that sufficiently agree.[30] How can there be reproducible patterns if there is no magazine with which to reproduce it?

Fourth, the articles presented to the trial court in support of Jeffress' testimony were never admitted into evidence and appear nowhere in the appellate record so there is no way to determine whether they actually supported Jeffress' methodology or constituted clear and convincing evidence of reliability. The court of appeals glosses over this glaring omission from the record by holding that *Kelly* only requires proof of the existence of such literature, the trial court was supplied with copies, and Jeffress was cross-examined with the articles.[31]

But such reasoning stands meaningful appellate review on its head since one of the supportive legs required by *Kelly* is the acceptance of the theory or methodology by the relevant scientific community. It is simply impossible for this or any other appellate court to make such a determination when the state—the party with the burden of establishing reliability by clear and convincing evidence in this instance—never moved

witness's qualifications or his bare opinions alone, that can settle an issue as a matter of law; a claim will not stand or fall on the mere *ipse dixit* of a credentialed witness.' ").

[30] Slip opinion, p. 25.
[31] Slip opinion, p. 24.

for the articles' admission into evidence or otherwise insured their inclusion in the record.

The court of appeals also relied on the fact that Jeffress brought a Power Point presentation to support his testimony.[32]  But Jeffress stated at the *Daubert* hearing that he created the presentation.[33]   If Jeffress' testimony is unreliable under the circumstances then his Power Point presentation is simply a summary of unreliable evidence.

And even Jeffress admitted that the ultimate determinations made by him were subjective.[34]  His statement, that "it is a subjective determination, but it's based on objective criterion [sic]" is exactly the kind of junk science gobbledygook that *Daubert* and *Kelly* were intended to preclude.  Likening his work to medical diagnosis is nothing more than an attempt to shore up his opinion with a weak analogy to a field—medicine—which is much more diverse, highly developed, and has a much longer history of acceptance by courts.

Finally, the court of appeals relied on testimony from Jeffress about the Brundage study conducted in 1994.[35]  But the Brundage study involved testing of bullets, not casings, to consecutively manufactured barrels, not

[32] Slip opinion, p. 20.

[33] RR vol. 3, pp. 14-15;  RR vol. 10, State's Exhibit F.
[34] Slip opinion, p. 26.

[35] Id., p. 21.

magazines.    Neither the Brundage study nor the proficiency testing performed by Collaborative Testing Services referenced by Jeffress were shown to have been sufficiently similar to the testing he performed to allow extrapolation of their error rates to tool mark examination on fired casings left by magazine lips.  And Jeffress himself never offered any evidence of an error rate for the specific type of tool mark examination he was doing, no doubt due to the fact that he had admittedly never offered testimony like this before and had only performed such examinations five other times.

In *Sexton* this Court left open the door for admission of such evidence by stating that the underlying toolmark theory *could* be reliable in a given case.[36]  But since then the only case successfully crossing that threshold is *Ramey v. State*,[37] and that case involved toolmark examination of bullets to match them to recovered weapons.  Therefore, the Court should grant this petition for review to determine whether under the circumstances the evidence of reliability is sufficient to warrant its admissibility.

### CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, Gordon Ray Lewis prays that his petition for discretionary review in the above styled and numbered cause be granted; allow full briefing on the issues raised; and reverse his

---

[36] *Sexton*, 93 S.W.3d at 101.

[37] 2009 WL 335276 (Tex. Crim. App. 2009).

judgment of conviction and remand this matter for a new trial. Lewis prays for such other and further relief, both general and special, at law or in equity, to which he may show himself to be justly entitled.

Respectfully submitted,

By: /s/*Michael W. Minton*
   MICHAEL W. MINTON
   State Bar No. 14194550

   THE LAW OFFICES OF
   MICHAEL W. MINTON, P.L.L.C.
   6100 Western Place, Suite W0541
   Fort Worth, Texas 76107
   mminton@mintonlaw.com
   Telephone: 817-377-9200
   Facsimile:  817-377-9201

## CERTIFICATE OF SERVICE

I hereby certify that on this the 10th day of February, 2013, a true and correct copy of the above and foregoing document was sent U.S. certified mail, return receipt requested and/or facsimile transmittal to all counsel of record in the above-styled and numbered cause.

/s/*Michael W. Minton*
MICHAEL W. MINTON

## CERTIFICATE OF COMPLIANCE

I hereby certify in accordance with Tex. R. App. P. 9.4(i) that the above and foregoing document was prepared with Microsoft Word for a total of 3,300 words.

/s/*Michael W. Minton*
MICHAEL W. MINTON

CASE NO. PD-0173-15


In the Court of Criminal Appeals
Austin, Texas


GORDON RAY LEWIS


Petitioner


V.


STATE OF TEXAS


Respondent


Appealed from the Second Court of Appeals
Fort Worth, Texas

Court of Appeals Cause No. 02-13-00367-CR

---

## **APPENDIX**

---

APPENDIX 1: Memorandum opinion in case number 02-13-00367-CR



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 02-13-00367-CR

GORDON RAY LEWIS                                                    APPELLANT

V.

THE STATE OF TEXAS                                                        STATE

----------

FROM THE 355TH DISTRICT COURT OF HOOD COUNTY
TRIAL COURT NO. CR12234

----------

## MEMORANDUM OPINION[1]

----------

Appellant Gordon Ray Lewis appeals his conviction for capital murder.  We affirm.

## Background Facts

Ormand Gene Sabin owned TJ's Bar and Grill, a restaurant where Appellant's girlfriend, Kimberly Milwicz, had worked until she was fired in late

---

[1]*See* Tex. R. App. P. 47.4.

December 2012. Milwicz was angry with Sabin for firing her, and she and Appellant wanted to rob the bar for revenge. On the night of January 16, 2013, Appellant offered his acquaintance, Justin Ragan, methamphetamines if he would go with him to rob Sabin. Witnesses saw Appellant that evening with a pistol and saw Appellant and Ragan "suiting up" in black clothes and hoodies as a "disguise." Appellant and Ragan appeared very high on methamphetamines.

The manager of a convenience store near TJ's saw Appellant in her store buying a fountain drink around 5:15 or 5:20 a.m. Another witness testified that Ragan's truck sped past him near TJ's sometime around 5:00 a.m. Sabin's employee, Brandy Shirley, discovered Sabin lying on the floor when she went in to help him open the bar. The phone at TJ's had been ripped from the wall, so Shirley ran to the convenience store and called 911 at 6:24 a.m. Paramedics arrived but could not revive Sabin.

At 6:38 a.m., Ragan called 911 and reported that his truck had been stolen. At 6:57 a.m., someone called 911 and reported that Ragan's truck was abandoned in front of his house with the engine still running. A black bag found inside the truck contained prescription pill bottles in Appellant's name and several unfired nine millimeter bullets. An expert witness testified that the casing found at the crime scene had been loaded in the same magazine as the unfired cartridges found in the truck. A straw and lid from a soft drink found on the passenger-side floorboard contained Appellant's DNA. Police later found a duffle bag of money in the abandoned house next to Appellant's house. Appellant

2

claimed to own the abandoned house and treated it like it was his property. Appellant was eventually arrested and charged with Sabin's murder.

Prior to trial, Appellant's mother was convicted of retaliation against Judge Ralph Walton, who was to preside over Appellant's case. Appellant filed a motion to recuse Judge Walton from his case. Judge Walton referred the motion to Judge Jeff Walker who, after a hearing, denied the motion.

After a trial, a jury found Appellant guilty of capital murder. The trial court sentenced Appellant to life imprisonment. Appellant then filed this appeal.

## Discussion

### I. Sufficiency of the evidence supporting Appellant's conviction

In Appellant's first issue, he argues that the evidence was insufficient to support his conviction because it amounted to only a "strong suspicion of guilt."

#### A. Capital murder and the standard of review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Dobbs*, 434 S.W.3d at 170; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). This standard gives full play

3

to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Dobbs*, 434 S.W.3d at 170.

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Dobbs*, 434 S.W.3d at 170. Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011); *see Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Dobbs*, 434 S.W.3d at 170.

A person commits capital murder if he intentionally or knowingly causes the death of an individual and commits the murder in the course of committing robbery. Tex. Penal Code Ann. § 19.02(b)(1) (West 2011). Appellant could be found criminally responsible for a capital murder offense committed by another

4

under two theories.[2] *See id.* § 7.02 (West 2011). Under subsection (a), a person is criminally responsible if he, with the intent to promote or assist the commission of the offense, solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id.* § 7.02(a)(2). Under subsection (b), he is responsible if in an attempt to carry out a conspiracy to commit robbery, the murder was committed by one conspirator in furtherance of the unlawful purpose and should have been anticipated as a result of carrying out the conspiracy. *Id.* § 7.02(b). "Section 7.02(b) does not require the State to prove that Appellant actually anticipated the secondary felony, only that the crime is one that *should* have been anticipated." *Anderson v. State*, 416 S.W.3d 884, 889 (Tex. Crim. App. 2013). In determining whether one has participated in an offense, the court may examine the events occurring before, during, and after the commission of the offense. *Beier v. State*, 687 S.W.2d 2, 3–4 (Tex. Crim. App. 1985); *Ervin v. State*, 333 S.W.3d 187, 201 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd).

**B. The evidence**

Ray Yates testified that one day he, Appellant, and Milwicz were driving to Fort Worth to buy methamphetamine when Appellant and Milwicz began discussing "robbing TJ's so that [Milwicz] could have the money, or someone, to go back to California or something like that. She was wanting to get out of Texas. I think she was in trouble already for something."

---

[2]The jury was instructed on both theories.

Rebecca Cleere testified that Ragan was at her house the night before the murder. While he was visiting, Appellant and Milwicz arrived. Cleere testified that Milwicz was aggravated and was talking about "wanting [Sabin] to be hurt, and he needed to get what he had . . . coming to him. She had lost her home, lost her job, and she blamed it all on him." Cleere said that Milwicz was trying to get someone to burglarize TJ's and if she could not get Appellant to do it, she would get someone else to do it. Cleere testified that Appellant asked Ragan to go with him to rob TJ's. Cleere testified that Ragan "thought it was a stupid idea to go out there to rob the old man for a few hundred dollars." Appellant then offered Ragan methamphetamines if he would go. Cleere also testified that another person who was sleeping at her house, Bryce Cobbs, "popped his head into the room," and Appellant asked him if he too wanted to go to TJ's.

Later that night, Ragan borrowed a car from a woman named Christina Munoz, who was visiting Michael Eubank's house down the street from Appellant's house. Munoz later decided she wanted her car back. Yates, who was also at Eubank's house, walked down the street to see if he could find the car. He found the car with Ragan and Appellant. He testified that "they looked pretty high" and were "suiting up for something." He believed they were suiting up for a robbery because they were wearing dark clothes and hoodies as a "disguise." He testified that he had a conversation with Appellant. He said,

> A. Well, I was trying to tell him that it wasn't a good idea, it was way too late or early, however you want to look at it.

6

Q. What wasn't a good idea?

A. To go rob TJ's.

. . . .

I mean pretty much anybody knows that the owner of the place gets there at four or five o'clock in the morning and—to drink coffee and eat breakfast. Some—somebody's going to be there or going to show up.

Q. And why is that a problem?

A. Well, if you're going to rob the place, you don't want nobody there.

. . . .

[I]t ain't going to go right. Either you're not going to be able to do it or any number of things.

Q. And how did [Appellant] respond to this?

A. He said he got it.

Q. What did that mean to you?

A. Keep out of his business.

Yates testified that Appellant owned two guns, including a nine-millimeter pistol, and that he had never seen Ragan with a gun. Yates admitted that the pistol that he saw could have been a BB gun.

Richard McClatchy testified that Appellant pulled a pistol or BB gun on him the evening before the murder. He testified that Ragan was very high that evening. McClatchy admitted that he had told police that Appellant was also very high and that he believed that "the odds of it being the same gun that was used

7

in the murder that was pointed at [him] was a ten on a scale of one to ten." McClatchy testified that he saw Ragan's truck drive by near TJ's around 5:00 a.m. He previously told the police that he might have seen someone else in the truck but that it was too dark to tell. Joshua Jenkins also testified that he saw Appellant and Ragan together that night.

On the morning of the murder, the manager of the convenience store down the street from TJ's saw Appellant enter her store around 5:15 or 5:20 a.m. Appellant bought cigarettes and a fountain drink. Justin Pratt testified that Appellant had told him that when he came out of the store, Ragan was loading a pistol and said, "Let's go."

Shirley called 911 from the convenience store at 6:24 a.m. Paramedics arrived at the scene at 6:30 a.m. A paramedic testified that because Sabin's body was still warm, he had been dead for less than an hour.

Eubank testified that he was at the convenience store at the time that Shirley ran from TJ's to use the phone. By the time he got back home, he saw Ragan "running from street to street, and then he came and—it looked like he was throwing up to me, he was across the street from my house." Ragan told him, "I shot him." Jenkins also testified that Ragan went to Eubank's house and that Ragan was "out of breath, sweating, [and] pale." Yates too testified that he saw Ragan that morning and that Ragan was "breathing hard, sweating, breathing hard, and seemed kind of out of it, scared." Ragan told Yates that he

8

had shot someone. Ragan used Eubank's phone to report his truck missing at 6:38 a.m.

Munoz saw Ragan later that morning as she was leaving the neighborhood. Ragan asked her for a ride. They stopped at a grocery store in Glen Rose. Ragan had a roll of money that he said he got from the bar. He told Munoz that he had shot somebody. Munoz later told the police that more money was hidden across the street from Eubank's house and "at [Appellant's] place."

Police located money stuffed inside some abandoned chairs across the street from Eubank's house. Police also found a duffle bag of money in the abandoned house next to Appellant's house. Appellant's ex-girlfriend testified that Appellant claimed that the abandoned house next to his mother's home was his property and that he kept a lock on the door. She testified that Milwicz lived with Appellant in the abandoned house for a period of time. Eubank also testified that Appellant would stay occasionally in the abandoned house. And Jenkins, who lived down the road from Appellant, testified that he believed that the abandoned house was "part of the same property" as Appellant's mother's house.

When police found Ragan's truck, they discovered a lid and straw on the passenger-side floorboard among a pile of ice. The lid and straw contained Appellant's DNA. The convenience store manager identified the lid and straw as the type sold in her store. Also in the truck was a black bag containing prescription pill bottles in Appellant's name, a bag of marijuana, baggies, rolling

9

papers, a radar detector, and several unfired nine-millimeter bullets. An expert witness testified that the casing found at the crime scene had been loaded in the same magazine as the unfired cartridges found in the truck.

Pratt testified that in June 2012, Appellant had admitted to him that he had been involved with Sabin's murder. Pratt testified, "He told me that—that he— that him and Justin Ragan were at a store right by the bar, and that he had gone in to get something to drink, and he came out and he saw Justin loading a gun, loading a pistol." Appellant told Pratt that he and Ragan went to TJ's but that Appellant did not go into the bar. Pratt testified that Milwicz went to the bar at the time of the murder to make sure that Sabin was there and that Appellant was "the one that made sure they had a gun."

In January 2012, a few days before Ragan's trial for Sabin's murder, Appellant made a phone call from Wise County jail in which he instructed a woman to "plead the Fifth." He also told the woman,

> If you find somebody out there that you figured out that they're going to try to talk on me, you find out where they're at and you get the number and information to my lawyer. He handles every bit of it. And it's not against the law like that. But if you go fucking with them, then it's tampering with a witness. See what I'm saying?

Cleere testified that Appellant also called her and told her to "plead the Fifth."

## C. Discussion

There was evidence that Appellant conspired with Ragan and Milwicz to rob Sabin. Witnesses testified that Appellant discussed with Milwicz plans to rob the bar and that Appellant solicited Ragan's help by offering methamphetamines.

10

Both Appellant and Ragan were seen hours before the murder wearing dark clothes and hoodies and appeared to be under the influence of methamphetamines. A bag with prescription pill bottles in Appellant's name also contained unfired cartridges for a nine-millimeter pistol, at least one of which had been loaded into the same magazine as the fired bullet found at the murder scene. Appellant's DNA was found on a straw and lid in Ragan's truck next to ice that had not yet melted. Ragan told one witness that money taken from TJ's was hidden "at [Appellant's] place," and police found a bag of money in a cabinet in the abandoned house next to Appellant's home. Three witnesses testified that Appellant treated the abandoned house like he owned it. *See Green v. State*, 839 S.W.2d 935, 944 (Tex. App.—Waco 1992, pet. ref'd) (holding that evidence of conspiracy to rob was sufficient when conspirators "assist[ed] each other in fleeing the scene and hiding the loot").

There was evidence that Ragan shot and killed Sabin during the course and in furtherance of the robbery. Three witnesses testified that Ragan told them he had shot someone during the robbery. Appellant was seen brandishing a nine-millimeter pistol that evening, and there was evidence upon which jurors could rely to infer that Appellant provided to Ragan the nine-millimeter pistol that Ragan used to shoot Sabin. One witness testified that Ragan was loading the pistol while Appellant was inside the convenience store buying a fountain drink.

There was also evidence that Appellant should have anticipated Sabin's murder. Yates testified that it was common knowledge that Sabin would be in

11

the bar at the time of the robbery. *See Moore v. State*, 24 S.W.3d 444, 447 (Tex. App.—Texarkana 2000, pet. ref'd) ("[W]hen an individual decides to steal property from a private residence, he should anticipate that he might be confronted and that his conspirators might react violently to that confrontation."). When Yates warned Appellant that Sabin's presence at the bar would "spoil your robbery," Appellant told him that "he got it." There was also evidence that Appellant provided the gun and bullets that Ragan used or that he knew that Ragan was armed. *See Nava v. State*, 379 S.W.3d 396, 408-09 (Tex. App.—Houston [14th Dist.] 2012) (holding that knowledge that co-conspirator was armed while committing theft supported finding that appellant should have anticipated a murder during commission of the crime), *aff'd*, 415 S.W.3d 289 (Tex. Crim. App. 2013); *Davis v. State*, 276 S.W.3d 491, 495 (Tex. App.—Waco 2008, pet. ref'd) ("Evidence that a defendant knew his co-conspirators might use guns in the course of the robbery can be sufficient to demonstrate that the defendant should have anticipated the possibility of murder occurring during the course of the robbery.").

Viewing all of the evidence in the light most favorable to the verdict, we hold that a rational trier of fact could have found beyond a reasonable doubt that Appellant was criminally responsible for the murder of Sabin during the robbery of TJ's Bar and Grill. *See Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (stating that the cumulative effect of all incriminating facts may support a conviction). We overrule Appellant's first issue.

## II. Appellant's motion for recusal

In Appellant's second issue, he argues that Judge Ralph Walton should have been recused from his case. Appellant's mother, Karen Adams, had been convicted of felony retaliation against Judge Walton. When Appellant was arrested for Sabin's murder, Adams had threatened to "take out the whole damn bunch," apparently referencing the sheriff, a sheriff's deputy, and Judge Walton.[3] Appellant filed a motion for recusal, arguing that because Adams was going to testify as an alibi witness for Appellant in his trial and because Judge Walton was Adams's victim and presiding over Appellant's trial, he should be recused. After a hearing on the motion, Judge Jeff Walker denied Appellant's motion.[4]

### A. Recusal and the standard of review

We review the denial of a motion to recuse under an abuse of discretion standard. Tex. R. Civ. P. 18a(j)(1)(A). A trial court abuses its discretion if the court acts without reference to any guiding rules or principles, that is, if the act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate

---

[3]Judge Walton was also assigned to Appellant's mother's retaliation case, but recused himself.

[4]When a recusal motion is timely filed, rule of civil procedure 18a requires a trial judge to either recuse himself or refer the motion for another judge to decide. *De Leon v. Aguilar*, 127 S.W.3d 1, 5 (Tex. Crim. App. 2004); *see* Tex. R. Civ. P. 18a; *see also Arnold v. State*, 853 S.W.2d 543, 544 (Tex. Crim. App. 1993) (holding that rule 18a applies in criminal cases).

court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620. Nor does a mere error in judgment rise to an abuse of discretion. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex. 1985).

We apply a reasonable person standard in determining whether a recusal motion should have been granted. *Duffey v. State*, 428 S.W.3d 319, 325 (Tex. App.—Texarkana 2014, no pet.) (citing *Woodruff v. Wright*, 51 S.W.3d 727, 736 (Tex. App.—Texarkana 2001, pet. denied)). The question is whether a reasonable member of the public at large, knowing all the facts in the public domain concerning the judge's conduct, would have a reasonable doubt that the judge is actually impartial. *Id.* (citing *Rogers v. Bradley*, 909 S.W.2d 872, 881 (Tex. 1995)). Accordingly, the need for recusal is triggered only when a judge displays an "attitude or state of mind so resistant to fair and dispassionate inquiry" as to cause a reasonable member of the public to question the objective nature of the judge's rulings. *Ex parte Ellis*, 275 S.W.3d 109, 117 (Tex. App.—Austin 2008, no pet.) (quoting *Liteky v. U.S.*, 510 U.S. 540, 557–58, 114 S. Ct. 1147, 1158 (1994) (Kennedy, J., concurring)).

Courts enjoy a "presumption of judicial impartiality" that "is not defeated by the mere assertion of bias based on a trial judge's previous judicial relationship with a defendant." *Abdygapparova v. State*, 243 S.W.3d 191, 198 (Tex. App.—San Antonio 2007, pet. ref'd) (citing *Durrough v. State*, 620 S.W.2d 134, 143

14

(Tex. Crim. App. 1981)). The movant bears the burden of proving that recusal is warranted, and it is a high one. *Id.* That burden is only satisfied when the movant provides facts demonstrating the presence of bias or partiality "of such a nature and extent as to deny the movant due process of law." *Id.*

## B. Denial of Appellant's motion was not an abuse of discretion

Appellant argues that recusal was required in this case under the reasoning of *Whitehead v. State*, 273 S.W.3d 285, 289 (Tex. Crim. App. 2008). In that case, Whitehead wrote a letter to his girlfriend threatening his therapist, his probation officer, and Judge Herod, the judge who presided at the trial revoking his community supervision. *Id.* at 286. Whitehead was charged only with retaliation against his probation officer, and Judge Herod presided at his retaliation trial. *Id.* Whitehead was subsequently convicted.

Whitehead appealed his retaliation conviction on the ground that Judge Herod was disqualified from presiding at his trial under article 30.01 of the code of criminal procedure. *See* Tex. Code Crim. Proc. Ann. art. 30.01 (West 2006) ("No judge or justice of the peace shall sit in any case where he may be the party injured."). The court of criminal appeals interpreted the phrase "may be the party injured" to mean that a judge is disqualified "if the evidence shows that he was among the defendant's victims in the criminal transaction or episode at issue, such that a reasonable person would harbor doubts as to the judge's impartiality." *Whitehead*, 273 S.W.3d at 289.

15

Appellant acknowledges that *Whitehead* pertained to disqualification under article 30.01, not recusal under rule 18b of the rules of civil procedure as was sought in this case.[5]  *See* Tex. R. Civ. P. 18b(b) (stating that a judge must recuse in any proceeding in which his impartiality might reasonably be questioned).  He argued at the hearing that Judge Walton was "an injured party and he would be a part of the criminal episode," but he also admitted that there was no evidence that Appellant injured Judge Walton.  Appellant claimed, but did not explain how, Judge Walton's rulings on the admissibility of testimony from an alibi witness who had previously been convicted of threatening him would create the appearance of bias.

Judge Walker's comments on the record demonstrate that in making his ruling, he referenced appropriate guiding rules and principles.  *See Low*, 221 S.W.3d at 614.  He explained,

> Merely that [Judge Walton] had been an injured party in the allegations, not the complaint but the allegations that were made by [Appellant]'s mother, allegedly made by his mother, was reason enough for him to get out of that case and he did so.  It does not pour over to this case.  There must be independent evidence of any bias before he is recused.  He is not an injured party in [Appellant's] case.  And so your claims that he's disqualified under Code of Criminal Procedure 30.01 [are] not well founded.  But you did not limit your motion to that particular statute . . . .  I'm looking at this as the pleadings are applied to Rule 18(a) of the Texas Rules of Civil Procedure, which apply in motions to recuse and there is no evidence to show that the Judge has a bias against [Appellant].

---

[5]Although Appellant cited both article 30.01 and rule 18b in his motion for recusal, he did not seek disqualification.  Even so, Judge Walker addressed both grounds in the hearing.

16

Now, when you talk about, all right, well, the judge knows one of the witnesses or the Judge knows something bad about one of the witnesses, or for that matter the Judge knows something good about one of the witnesses, does that disqualify the Judge? No. You have to take that in light of how the Judge will rule, as opposed to not the witness but to the party who is before the Judge. And there's no evidence to show that the Judge would be biased against [Appellant] for any act that his mother may have committed or not committed. And for those reasons the motion will be denied.

Judge Walker found that Appellant did not meet his burden to demonstrate that Judge Walton's judicial history with one witness in Appellant's trial made him "resistant to fair and dispassionate inquiry," and we cannot disagree. *Cf. Abdygapparova*, 243 S.W.3d at 198–99 (stating that "[b]ias sufficient to warrant recusal generally stems from an extrajudicial source" and that "information that a trial judge gained about a defendant's case from previously trying a co-defendant is not information gained from an extrajudicial source") (citing *Roman v. State*, 145 S.W.3d 316, 321 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd)). Judge Walker's ruling was not outside the zone of reasonable disagreement and was therefore not an abuse of discretion. We overrule Appellant's second issue.

## III. Expert testimony

In Appellant's third issue, he argues that the trial court erred by failing to exclude expert testimony linking a bullet casing found at the crime scene to ammunition found in the vehicle because it was unreliable.

### A. Standard of review

We review a trial court's decision to admit or exclude scientific expert testimony under an abuse of discretion standard. *See Weatherred v. State*, 15

S.W.3d 540, 542 (Tex. Crim. App. 2000). The proponent of the scientific evidence must demonstrate through clear and convincing evidence that the evidence is reliable. *Id.* "'[R]eliability depends upon whether the evidence has its basis in sound scientific methodology,'" which "'demands a certain technical showing.'" *Vela v. State*, 209 S.W.3d 128, 133 (Tex. Crim. App. 2006) (quoting *Jordan v. State*, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996)). The test for expert reliability requires that (1) the underlying scientific theory be valid, (2) the technique applying the theory be valid, and (3) the technique have been properly applied on the occasion in question. *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). Factors that could affect a trial court's determination of expert reliability include, but are not limited to: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the testifying expert; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question. *Id.*

**B. The evidence**

James Jeffress is a forensic scientist in the firearm toolmark section of the Texas Department of Public Safety Crime Laboratory in Garland, where he has

been employed for over five years.  He has a bachelor's degree in biology from Texas A&M University and a master's degree in forensic science from Virginia Commonwealth University.  Jeffress underwent an eighteen-month training program on firearm and toolmark identification.  His training included "discussion of machining processes, historical firearm tool development, as well as performing thousands of microscopic comparisons of toolmarks made by various tools."  He has been a guest lecturer in forensic courses at the University of Texas at Dallas and has taught classes in high schools, middle schools, and local civic groups.  Jeffress has published three articles in the Scientific Journal of the Association of Firearm and Tool Mark Examiners.  Jeffress has testified as an expert in about eighteen cases in approximately eight different counties.

Jeffress explained toolmark examination to the court:

> Firearm toolmark examination is based on the premise that no two manufactured objects are exactly alike.  When you make a tool of any sort, whether it's a set of pliers or the barrel to a firearm, these tools are made by a metal-on-metal forming process. Essentially, you whittle it down from large blocks of metal.

> And during this formation process, microscopic chips are created by the wearing of the tool.  So just as if you were whittling a block of wood, your knife would get dull, so too do these machining processes.  These microscopic chips are irregular in nature and randomly distributed.  These microscopic imperfections are unique to that tool and that tool alone, and . . . are then imparted on any softer material that that tool touches.

He also explained that toolmark identification "is a subjective determination, but it's based on objective criterion.  It's based on the objectivity that is without bias and based on direct observation."

19

Jeffress testified that he conducts toolmark identification tests "daily" and has done so for over five years, but he does not necessarily do magazine lip mark analysis daily. He testified that he has done this specific type of identification in "at least five cases." He admitted that he has never testified in court specifically about magazine lip analysis.

Jeffress testified that toolmark comparison is

widely accepted within the forensic science community because we had a scientific working group for firearms identification. It is a federally funded group sponsored by the National Institute of Justice. We also have the Association of Firearm Toolmark Examiners, which is an international organization of firearm toolmark examiners. It's been a recognized discipline in the United States since the 1930s and in the Texas Department of Public Safety since 1935. It's been admitted in U.S. courts.

Jeffress identified three different journals that publish peer-reviewed articles on toolmark identification: the Association of Firearm Toolmark Examiner Journal, Forensic Science International, and the Journal of Forensic Science. The State presented to the court five articles specific to toolmarks left by gun magazines.

Jeffress provided a PowerPoint presentation, which was admitted into evidence. The presentation cited a number of studies on "consecutive manufacture" testing.[6] The studies noted which guns and knives are the most

---

[6]Jeffress described consecutive manufacture studies:

What we do is—the standard in our discipline is to test items that have been consecutively manufactured, that is, one right after the other right off the assembly line. These tools will have the most

20

difficult for matching toolmarks because of "subclass carryover," which he explained occurred when "a tool [makes] some of the same marks from one piece to the next. They're not individual characteristics because they're not unique to a specific tool." Jeffress's presentation also discussed "black-box validation studies," which he described as "very similar to double-blind studies conducted for medical trials." He listed the error rates associated with each validation study.

Jeffress discussed two different tests used to identify the potential rate of error. The first, called the Brundage study, was started in 1994, and "that test has been distributed to hundreds of examiners nationally and internationally." In the Brundage test, "[p]articipants are given a set of 15 unknown bullets, and with an error rate of approximately .6 percent, we've—other than that, 99.4 percent of respondents have been able to correctly identify all of those bullets to those consecutively manufactured barrels."

Jeffress also discussed the annual proficiency tests from Collaborative Testing Services. He testified that there is a 1.4% error rate on that exam, but he

amount of microscopic agreement that is possible because they haven't been used, they haven't been abused, and they have the most minimum amount of tool wear.

And what we've done, all those studies listed are consecutive manufacture studies, that time after time after time again show that examiners could differentiate which ones were made with which tool, even consecutively manufactured.

21

noted, "These tests may be taken by people that aren't trained examiners, they may be taken by trainees. They also may not have a hundred percent response rate, and also might not be checked as thoroughly as standard case work is, much like all of ours go through verification." Jeffress testified,

> [W]e have a wide variety of standards and controls in place in our laboratory. Every microscopic comparison we make is independently analyzed by another trained firearms examiner. It's a process we termed "verification." And all of our work is one hundred percent verified.

> So another qualified examiner looks at all of my microscopic comparisons, and they must reach the same conclusion that I do.

Jeffress said that his conclusions in this case were verified.

**C. Discussion**

Appellant argues that Jeffress was not a reliable witness because he had never before testified about toolmarks from magazines. However, he also testified that he has done this specific type of identification in "at least five cases." He has over five years' experience in toolmark analysis and has three published, peer-reviewed articles on the subject. His knowledge, skill, experience, training, and education weigh in favor of reliability. *See Sexton v. State*, 93 S.W.3d 96, 100 (Tex. Crim. App. 2002) (weighing the *Kelly* factors in determining whether expert testimony was reliable).

Appellant also argues that Jeffress could not recreate toolmarks with the actual tool because the gun was never recovered. However, Jeffress testified that having the murder weapon to use for testing does not result in a better

22

probability that the conclusions from the comparison are correct. He said that having the actual tool that made the mark is "immaterial if you still have sufficient agreement of microscopic marks." He explained, "We frequently get cartridge cases for which no gun is ever recovered, and we are able to compare and say that they were fired in a single, yet unknown firearm." Jeffress discussed the process by which toolmarks are compared, the error rate in toolmark identification, and the verification process used to support his conclusions. These too weigh in favor of reliability.

Appellant next argues that Jeffress's procedures were "controlled by the investigator." Jeffress testified that the first cartridge he compared to the spent cartridge found at the crime scene matched, so he called the investigator to let him know his conclusion. The investigator told him "that one was sufficient." There was no evidence that the investigator controlled Jeffress's methods of comparison, directed him to which cartridge to test, or influenced Jeffress's conclusions or those of the examiner who verified them. Appellant claims that additional testing would have either strengthened or undercut Jeffress's opinion. But testing of the additional cartridges would only have determined whether each of those cartridges had been cycled through the same magazine as the tested and spent cartridges; it would not have strengthened or weakened Jeffress's conclusion regarding the first tested cartridge.

Finally, Appellant argues that there is no evidence supporting Jeffress's expert opinion because the articles that the State submitted to the trial court were

23

not admitted into evidence and therefore cannot be considered. The *Kelly* test requires evidence of "the existence of literature supporting or rejecting the underlying scientific theory and technique." *Kelly*, 824 S.W.2d at 573. Jeffress testified to the existence of supportive articles, copies of such articles were provided to the trial court and opposing counsel, and Appellant cross-examined Jeffress in detail regarding their substance while referring to the article as "what the State has entered into evidence." Under the standard of review, we cannot say that the State's failure to admit the articles into evidence tips the *Kelly* factors, on the whole, away from reliability particularly in light of the testimony elicited by Appellant concerning the substance of the articles.

Appellant argues that "this case is a mirror image" of *Sexton*, 93 S.W.3d at 96. In *Sexton*, the court of criminal appeals concluded "based on the record before [it], that the underlying theory of toolmark examination could be reliable in a given case, but that the State failed to produce evidence of the reliability of the technique used in [that] case." *Id.* at 101. However, there are a number of differences in the testimony presented in *Sexton* and that presented in this case. The testifying expert in *Sexton* "did not say whether he was familiar with the manufacturing process of the magazine or magazines that he said left identifiable marks on the live rounds and cartridge cases." *Id.* Further, the expert acknowledged that he had never matched magazine marks in a case before. *Id.*; *Sexton v. State*, 12 S.W.3d 517, 520 (Tex. App.—San Antonio 1999), *rev'd*, 93 S.W.3d 96.

24

In the present case, the trial court conducted a *Daubert* hearing at which the State offered both Jeffress's testimony as well as a PowerPoint presentation by Jeffress that aided in establishing his knowledge and explanation of the magazine lip analysis procedure, the scientific method behind it, that method's validity and accuracy, and its acceptance in the scientific community. Jeffress explained in detail and with the aid of pictures how the manufacturing process creates microscopic imperfections that are unique to a tool or magazine. Jeffress testified that when looking at these microscopic marks, firearm toolmark experts look for reproducible patterns that sufficiently "agree[]." He explained, "[W]hen [we] go through training, we look at thousands and thousands of microscopic comparisons. It gives us a baseline of what constitutes . . . enough . . . marks for identification. . . . [W]e develop this pattern threshold of what a sufficient agreement consists of." He defined "sufficient agreement" as the "chance that another tool could have made those marks is considered a practical impossibility." Through Jeffress's testimony, the State in this case, unlike in *Sexton*, met the required showing of a technical basis for the trial court to find that the testimony was based in sound science and was reliable.

In *Sexton*, the State introduced a treatise that contradicted its own expert's testimony that the technique of magazine mark comparison was one hundred percent accurate. 93 S.W.3d at 101. The court of criminal appeals held that the expert's bare assertion, contradicted by available literature, weighed in favor of

25

excluding the testimony. *Id.* Jeffress, on the other hand, testified that in order to claim that a method is one hundred percent accurate,

> you must test every firearm or every tool ever made, that ever has been made, and ever will be made. So that is when we say "practical certainty" or "to a reasonable degree of scientific certainty" because that's what the limits of science provide. We cannot be absolutely 100 percent certain of anything.

He explained that the process he employed was much like what a doctor or radiologist does in diagnosing a disease. He said,

> [I]t is a subjective determination, but it's based on objective criterion. It's based on the objectivity that is without bias and based on direct observation. So based upon looking at these patterns, we look at them and we essentially—we made that conclusion that they were, in fact, made from the same tool.

He then testified that his opinion was that, within a reasonable degree of scientific certainty, the toolmarks matched in this case. Jeffress's testimony does not mirror the "bare assertions" in *Sexton*; in fact, his thorough explanation of the method's accuracy weighs in favor of allowing the testimony. We therefore do not find *Sexton* controlling in this case.

The deficits present in the expert's testimony in *Sexton* were not seen here in Jeffress's testimony. The State presented clear and convincing evidence that the proferred scientific evidence is sufficiently reliable. We therefore overrule Appellant's third issue.

26

**IV. Exculpatory or impeachment evidence**

In Appellant's fourth issue, he argues that the State failed to disclose exculpatory or impeachment evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

After Appellant's conviction, he filed a motion for new trial, arguing that the State withheld information that a Texas Ranger had interviewed Bryce Cobbs about whether Appellant had been at Rebecca Cleere's house the night of the murder. *See generally Pena v. State*, 353 S.W.3d 797, 807–09 (Tex. Crim. App. 2011) (holding defendant preserves *Brady* error by raising issue in motion for new trial if nondisclosure not discovered until after jury retires to deliberate). Appellant discovered that Cobbs had been interviewed when Cobbs sent Appellant a letter. The letter stated, in pertinent part,

> Hey bro[,] I hope you['re] keeping your head up. I heard about you getting life in prison. I'm really sorry that happened to you[,] bro. A [T]exas [R]anger drove all the way to Oklahoma to question me about the murder. He told me [Cleere] told him that I was the[re] the night you and [Milwicz] and Ragan were at her house talking about what y[']all were gonna go do. I told him that I didn't remember being the[re]. He wanted me to testify against you but I told him that I wouldn't.

Appellant argues that Cobbs's testimony would have been favorable to Appellant and that the letter "undercut[s] Rebecca Cleere's testimony about what happened on the night when Milwicz, Lewis[,] and R[a]gan allegedly discussed the robbery."

27

## A. Brady violations and the standard of review

We review a trial court's denial of a motion for new trial for an abuse of discretion. *McQuarrie v. State*, 380 S.W.3d 145, 150 (Tex. Crim. App. 2012).

The prosecution violates a defendant's due process rights if it suppresses, either willfully or inadvertently, exculpatory or impeaching evidence that is material. *Banks v. Dretke*, 540 U.S. 668, 691, 124 S. Ct. 1256, 1272 (2004); *Brady*, 373 U.S. at 87, 83 S. Ct. at 1196–97; *Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006). However, *Brady* does not impose a duty on the State to provide facts known to or discoverable by the defendant. *See Havard v. State*, 800 S.W.2d 195, 204–05 (Tex. Crim. App. 1989); *see also Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996) (holding that a *Brady* violation does not arise if the defendant, using reasonable diligence, could have obtained the information).

The three-pronged test to establish reversible error for a *Brady* violation requires that Appellant prove (1) the State failed to disclose evidence, regardless of the prosecution's good or bad faith; (2) the withheld evidence is favorable to him; and (3) the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different. *Pena*, 353 S.W.3d at 809, 812. We analyze an alleged *Brady* violation "in light of all the other evidence adduced at trial." *Hampton v. State*, 86 S.W.3d 603, 612–13 (Tex. Crim. App. 2002).

Favorable evidence includes evidence that disputes, disparages, denies, or contradicts other evidence. *Pena,* 353 S.W.3d at 812. The defendant must

28

show that there is a reasonable probability that had the evidence been disclosed to the defense, the result would have been different. *See id.*; *Pitman v. State*, 372 S.W.3d 261, 271 (Tex. App.—Fort Worth 2012, pet. ref'd).

**B. The evidence**

Appellant testified at the hearing on his motion for new trial that he had tried to find Cobbs prior to his trial because "Cobbs'[s] name was brought up by the State." The Texas Ranger who interviewed Cobbs, Danny Briley, testified that he had located Cobbs through a database to which he had access. Briley testified that there are similar databases that private individuals can use to locate people. Briley listened to Cleere's testimony, and he stated that it was consistent with what Cobbs had told him. He testified that by the end of the interview, Cobbs conceded that he must have been at Cleere's house that night but just could not remember it. He believed that Cobbs's statements were favorable to the State's case.

Patrick Berry, the Assistant District Attorney for Hood County, testified that he had spoken to Appellant's trial counsel about Cobbs. Berry testified,

> [Appellant's counsel] asked me if we intended to call Bryce Cobbs, and I replied to him that—and this was after I had spoke[n] to Mr. Briley about his conversation with Mr. Cobbs—that I did not believe we were going to call Cobbs because he didn't remember anything.

**C. Discussion**

The evidence at the hearing was that not only was Appellant aware that Briley had found and interviewed Cobbs but that Cobbs's location was easily

29

discoverable through public databases. Thus, there was no *Brady* violation in this case. *See Westley*, 83 F.3d at 726; *Havard*, 800 S.W.2d at 204–05. Further, even if Cobbs's information had not been disclosed and could not have been easily discovered, Appellant has not demonstrated that Cobbs's testimony would have been favorable to him and was material. Cobbs's letter stated that he did not remember being at Cleere's house. That is consistent with Briley's testimony regarding his interview with Cobbs and Berry's testimony regarding why he told Appellant's counsel that they would not be calling Cobbs to testify. *See Pitman*, 372 S.W.3d at 271 (holding that appellant failed to establish undisclosed notes were favorable when other witnesses' testimonies were generally consistent with the undisclosed documents). Cobbs's testimony that he could not remember being at Cleere's house neither bolsters nor undercuts Cleere's testimony; it is neutral evidence, not favorable to either side. There is no requirement under *Brady* to disclose neutral evidence. *See Scaggs v. State*, 18 S.W.3d 277, 295 (Tex. App.—Austin 2000, pet. ref'd) (citing *United States v. Dillman,* 15 F.3d 384, 390 (5th Cir.1994) ("Although exculpatory and impeachment evidence fall within the purview of *Brady*, neutral evidence does not.")). Accordingly, because the trial court could have reasonably concluded that the alleged *Brady* evidence was neither favorable nor material to Appellant's defense, we hold that it did not abuse its discretion by denying Appellant's motion for mistrial. *See Pena*, 353 S.W.3d at 809; *Hawkins*, 135 S.W.3d at 76–77. Therefore, we overrule Appellant's fourth issue.

**Conclusion**

Having overruled Appellant's four issues on appeal, we affirm the trial court's judgment.

/s/ Lee Gabriel

LEE GABRIEL
JUSTICE

PANEL: MCCOY, MEIER, and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: December 18, 2014