**James Robert WILLIAMS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 2–95–438–CR.**

Court of Appeals of Texas,
Fort Worth.

Nov. 21, 1996.

Discretionary Review Refused
March 12, 1997.

---

5. Nothing in our opinion today affects the jury    verdict in the first lawsuit.

**400**

Bill Loveless, Denton, for Appellant.

Bruce Isaacks, Criminal District Attorney, Dawn A. Moore, Roger Jones, Lisa Decker, Assistant District Attorneys, Robert Huttash, State Prosecuting Attorney, Denton, for Appellee.

Before LIVINGSTON, RICHARDS and HOLMAN, JJ.

## OPINION

HOLMAN, Justice.

A jury found James Robert Williams guilty of possession with intent to deliver a controlled substance, methamphetamine. The indictment included two enhancement paragraphs that the jury found to be "true," and they assessed punishment of 75 years' confinement in the Institutional Division of the Texas Department of Criminal Justice. The issues on appeal are: (1) whether a State's chemist was qualified properly to allow her to testify as an expert witness, (2) the sufficiency of evidence, and (3) whether there was a variance between the offense alleged in the indictment and the proof adduced at trial. We affirm.

## Background

Douglas Spigler testified that at the time of the charged offense, he was a Flower Mound police officer, assigned to work as an undercover officer of the Denton County Narcotics Task Force. He posed as a construction worker and in Lewisville, on December 12, 1994, Williams asked Spigler whether he was interested in buying a quarter ounce of amphetamine (speed). Officer Spigler said yes and paid Williams an agreed price of $450. The pair then drove to Arlington in the officer's truck and stopped at a restaurant parking lot and waited until a woman drove up in a car. Williams then left Spigler's truck, got into the automobile, and the woman drove Williams away. About 20 minutes later, she returned Williams to the parking lot, and he got back into the truck. The officer drove Williams back to an apartment in Lewisville. Williams went into a separate room, closed the door, then returned to the room where the officer was and handed him a Ziploc clear plastic baggie containing a substance.

Officer Spigler took the baggie to the task force office and performed a narcotics identification "field test" on a small quantity of the contents of the baggie. It tested positive for methamphetamine or amphetamine. He heat-sealed the baggie, marked it with his initials, and put it inside the task force evidence locker. Only Officer Spigler and Pat Shaw, a Denton County sheriff's department evidence custodian, had a key to the locker. At the January 1995 term of the Denton County Grand Jury, Williams was indicted for the December 12, 1994 offense of knowingly and intentionally possessing with intent to deliver a controlled substance, methamphetamine, of 4 grams or more but less than 200 grams by aggregate weight including any adulterants and dilutants. Williams was arrested July 13, 1995.

At the trial, Officer Spigler identified the baggie as State's exhibit 4. Pat Shaw testified that she took the baggie from the locker, verified that it was still heat-sealed, and personally took it to a DPS chemical laboratory technician in Garland in that same condition.

### The State's Expert Witness

As its expert witness, the State presented Kaye Davis, a chemist for the Texas Department of Public Safety (DPS) Crime Laboratory in Garland. Out of the jury's presence, she testified that she had a degree in biology and chemistry, was trained by the Austin DPS laboratory, and had 17 years' experience as a DPS chemist. She had attended federal Drug Enforcement Agency schools on drug analysis and clandestine laboratories and was a member of the Southwest Association of Forensic Scientists.

She told the court that she had tested and analyzed the contents of State's exhibit 4 and that the tests she performed were recognized by persons in her profession as being accurate tests to determine the presence of controlled substances. She stated that the equipment she used in the tests was working properly and that it was recognized as the proper equipment for performing those tests. The tests were ultraviolet spectrophotometry, infrared spectroscopy, and the Marquis test, and she explained the purpose of each test and how it was performed. The chemist told the court that her work is reviewed every six months by a Drug Peer Review Committee, composed of chemists from different regional DPS laboratories, and that her laboratory is inspected every five years by the American Society for Crime Laboratory Directors, composed of persons from different laboratories across the United States.

On cross-examination before the judge, Davis was asked to name treatises or professional literature dealing with the types of tests she had conducted on the baggie's contents. She testified that "there are some books that deal with that, but I can't think of any specific titles." She told the court that the particular testing instrument "will either work or it won't" and that as long as the instrument is calibrated, "[t]here's not really that much error."

When the chemist finished testifying out of the jury's presence, the court ruled that she is an expert, her testimony is relevant and based on reliable information, and can be explained suitably to the jury. When the jury returned, but before Kaye Davis began to testify in their presence, Williams made the following objection, which the court overruled:

> [T]hat the methodology that she has informed us that she used; that is, the visual comparison of the spectra or the graphs produced by the spectra is not a scientifically reliable method of testing substances or alleged controlled substances.

> The reasons for that are that there's no evidence as to the statistical variability of this method. The method is not contained in any learned treatise that she could testify to. There's no mention of what the error rate is for this methodology. And there is no peer review performed by an outside group of people concerning this methodology.

### Admissibility of State's Exhibit 4

Williams' first point of error is that the trial court erroneously admitted State's exhibit 4 as evidence. Williams reasons that the exhibit's admission in evidence was based on testimony from a chemist who was not a qualified expert and whose testing was not reliable. The applicable rule of evidence is Rule 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

TEX.R.CRIM.EVID. 702.

The trial court had the responsibility of determining whether the chemist was qualified to testify as an expert witness. *See* TEX.R.CRIM.EVID. 104(a). Williams assumes that when the prosecutor questioned the chemist about her qualifications to be an expert witness, he was trying to convince the trial court to evaluate her qualifications in light of the seven factors listed in *Kelly v. State*, 824 S.W.2d 568, 573 (Tex.Crim.App. 1992):

> (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained;

(2) the qualifications of the expert(s) testifying;

(3) the existence of literature supporting or rejecting the underlying scientific theory and technique;

(4) the potential rate of error of the technique;

(5) the availability of other experts to test and evaluate the technique;

(6) the clarity with which the underlying scientific theory and technique can be explained to the court; and

(7) the experience and skill of the person(s) who applied the technique on the occasion in question.

*Kelly,* 824 S.W.2d at 573. Although the State's brief concedes that the seven *Kelly* factors are consistent with Rule 702, the State appears to rely on the rule alone and does not concede that *Kelly* sets the standard by which a trial court should gauge the qualifications of an expert. The State argues that a trial court's principal guide in these matters is Rule 702.

Williams argues that as a general reliability test for the admission of scientific or expert evidence, *Kelly* "is no longer valid." Although Williams insists that the predicate for admission of scientific evidence "is much more stringent than that employed by the State in this case," Rule 702 suggests that the way a trial court decides whether the testimony of a witness called as an expert qualifies as relevant, reliable, and admissible is to screen the proposed testimony in advance for scientific content that will help the jury understand the evidence and determine a fact issue. Nevertheless, Williams urges us to hold that the screening process may only follow the precepts of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589–90, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469 (1993). *Daubert* lists four factors for a trial court to consider when screening the theories or techniques that an expert wishes to testify about:

(1) whether a theory or technique has been tested;

(2) whether the theory or technique has been subjected to peer review and publication;

(3) the court ordinarily should consider the known or potential rate of error; and

(4) the general acceptance of the theory or technique in the scientific community.

*Id.* at 591–95, 113 S.Ct. at 2796–97.

Despite Williams' insistence that *Kelly* is no longer valid, it was discussed approvingly by the Court of Criminal Appeals as recently as last June. *See Jordan v. State,* 928 S.W.2d 550, 553–555 (Tex.Crim.App.1996). Under Rule 702, a trial court must decide whether expert testimony will be sufficiently reliable and relevant to help the jury. *Id.* at 553. Reliability depends on three criteria:

(a) the underlying scientific theory must be valid;

(b) the technique applying the theory must be valid; and

(c) the technique must have been properly applied on the occasion in question.

*Id.* at 554.

The Court of Criminal Appeals views *Daubert's* relevance and reliability standard as "virtually identical" to the *Kelly* standard. *Id.* Additionally, the Texas Supreme Court has acknowledged that in matters applying Rule 702 it too is persuaded by the reasoning of both *Daubert* and *Kelly. E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556 (Tex.1995). In Texas, Rule 702 is the same for either civil or criminal cases, so the Texas Supreme Court's opinion in *Robinson* is at least instructive. Although it has not expressly adopted the *Robinson* reasoning, the Court of Criminal Appeals has recognized that *Robinson* is "[i]n line with this Court and the United States Supreme Court" in requiring that expert testimony must show relevancy and that it is based on a reliable scientific foundation. *Jordan,* 928 S.W.2d at 555. The focus of *Kelly, Daubert,* and *Robinson* was on deciding the scientific reliability of the proposed evidence. *Id.*

In *Robinson,* the Texas Supreme Court not only adopted the four *Daubert* factors, it also endorsed two more:

* the extent to which the technique relies upon the subjective interpretation of the expert; and

* the non-judicial uses which have been made of the theory or technique.

*Robinson*, 923 S.W.2d at 557. But equally significant, *Robinson* emphasizes that the six factors it approves are nonexclusive and that trial courts may consider other factors that are helpful in determining the reliability of the scientific evidence and that those factors will differ with each particular case. *Id.*

We conclude that when determining the admissibility of scientific evidence in criminal cases, a trial court must adhere to the formula of Rule 702 as illuminated by *Jordan* and *Kelly*. *Kelly* is bolstered by *Daubert* and *Robinson*, but neither they nor *Jordan* alter *Kelly*'s principles. Here, the trial court appears to have complied with Rule 702 and the applicable case law in finding that the proffered testimony of chemist Kaye Davis was relevant, that the tests she performed on the contents of the baggie were scientifically reliable, and that she was qualified to testify as an expert on the subject. A trial court has broad discretion in determining the admissibility of evidence. Tex.R.Crim.Evid. 104(a); *McVickers v. State*, 874 S.W.2d 662, 664 (Tex.Crim.App.1993). We find no error in the trial court's decision to let the jury hear Davis testify and to admit exhibit 4.

Williams' final argument under his first point of error is that because the trial court sustained various objections by the State, he was prevented from asking the chemist additional relevant questions that he says were necessary to fully protect his rights under *Daubert*. However, Williams did not preserve that complaint by requesting that he be allowed to make a bill of exceptions. *See Love v. State*, 861 S.W.2d 899, 901 (Tex.Crim.App.1993). Also, Williams did not preserve the complaint by showing what the testimony would have been if he had been allowed to have the chemist answer the additional questions he wanted to ask. *See Moosavi v. State*, 711 S.W.2d 53, 55 (Tex.Crim.App.1986).

The first point of error is overruled.

### Sufficiency of the Evidence

The gist of the second point of error is that there was insufficient evidence to convict Williams of the offense because the evidence showed that the substance in the baggie may have contained a "cutting agent," yet the State did not prove that the cutting agent had not diluted the controlled substance below the indictment's description of 4 grams or more. Williams argues that the State had to prove that the baggie did in fact contain at least 4 grams of controlled substance and that any cutting agent in the baggie was a material added to increase the bulk and did not affect the chemical activity of the controlled substance. The DPS chemist, Kaye Davis, testified that there might be a cutting agent in the baggie's contents but that she did not "quantitate" the methamphetamine.

In reviewing the legal sufficiency of the evidence to support a conviction, we view the evidence in the light most favorable to the verdict. *Narvaiz v. State*, 840 S.W.2d 415, 423 (Tex.Crim.App.1992), *cert. denied*, 507 U.S. 975, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993). The critical inquiry is whether, after so viewing the evidence, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Emery v. State*, 881 S.W.2d 702, 705 (Tex. Crim.App.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1257, 131 L.Ed.2d 137 (1995). This standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

The legal sufficiency of the evidence is a question of law. The issue on appeal is not whether we as a court believe the State's evidence or believe that the defense's evidence outweighs the State's evidence. *See Matson v. State*, 819 S.W.2d 839, 846 (Tex.Crim.App.1991); *Wicker v. State*, 667 S.W.2d 137, 143 (Tex.Crim.App.), *cert. denied*, 469 U.S. 892, 105 S.Ct. 268, 83 L.Ed.2d 204 (1984). The verdict may not be overturned unless it is irrational or unsupported by proof beyond a reasonable doubt. *Matson*, 819 S.W.2d at 846.

Williams submits that two 1993 Court of Criminal Appeals cases illustrate the State's burden of proof for his own case. *See Thorpe v. State*, 863 S.W.2d 739, 741 (Tex.

Crim.App.1993); *Cawthon v. State*, 849 S.W.2d 346, 349 (Tex.Crim.App.1992). At page 741, the *Thorpe* opinion cites and quotes from *Cawthon:*

[W]hen adulterants and dilutants constitute a part of the weight utilized to increase punishment, the State must prove the following beyond a reasonable doubt: (1) the identity of the named illegal substance, (2) that the added remainder (adulterants and/or dilutants) has not affected the chemical activity of the named illegal substance, (3) that the remainder (adulterants and/or dilutants) was added to the named illegal substance with the intent to increase the bulk or quantity of the final product, (4) the weight of the illegal substance, including any adulterants and/or dilutants.

*Cawthon,* 849 S.W.2d at 348–49. *Cawthon* quotes with approval from *Reeves v. State,* 806 S.W.2d 540, 542 (Tex.Crim.App.1990), *cert. denied,* 499 U.S. 984, 111 S.Ct. 1641, 113 L.Ed.2d 736 (1991), which describes "adulterants or dilutants" as "compounds, substances, or solutions added to the controlled substance to increase the bulk or quantity of the final product [without affecting its activity]." *Cawthon,* 849 S.W.2d at 348. *Reeves* held that the State must prove that the controlled substance, plus any adulterants or dilutants proved to exist within it, weighs at least as much as the minimum weight alleged in the indictment. *Reeves,* 806 S.W.2d at 542. "Adulterants" and "dilutants" are sometimes called "cutting agents." *McGlothlin v. State,* 749 S.W.2d 856, 860 (Tex.Crim.App.1988).

█ Chemist Kaye Davis testified that the contents of State's exhibit 4 weighed 6.54 grams. The minimum weight of controlled substance alleged in Williams' indictment is 4 grams. Davis conceded on cross-examination that she did not do any test to determine the weight of the cutting agent minus the methamphetamine that was in the baggie. The State's argument is that because of the definition of "adulterant or dilutant" contained in the Health and Safety Code, the prosecution met its burden of proving that the baggie's contents weighed more than the minimum alleged in the indictment simply by proving the gross weight of the baggie's con-

tents (6.54 grams). The definition became effective September 1, 1994:

Adulterant or dilutant means any material that increases the bulk or quantity of a controlled substance, regardless of its effect on the chemical activity of the controlled substance.

TEX. HEALTH & SAFETY CODE ANN. § 481.002(49) (Vernon 1994); *see* Act of May 29, 1993, 73rd Leg., ch. 900, § 2.01, 1993 Tex. Gen. Laws 3705 (current version at TEX. HEALTH & SAFETY CODE ANN. § 481.002(49) (Vernon Supp.1996)).

The result of the definition is that by the time of Williams' alleged offense and subsequent trial, the State no longer had to meet one of the *Cawthon* requirements, that is, proving that the added adulterants or dilutants had not affected the chemical activity of the controlled substance. *See Cawthon,* 849 S.W.2d at 349. The definition quoted above is within the part of the code known as "The Texas Controlled Substances Act" and supports the State's contention, especially when read together with another section of the code that was a foundation for Williams' indictment:

[a]n offense ... is a felony of the second degree if the amount of the controlled substance possessed is, by aggregate weight, including adulterants and dilutants, four grams or more but less than 200 grams.

TEX. HEALTH & SAFETY CODE ANN. § 481.115(b) (Vernon 1994); *see* Act of May 29, 1993, 73rd Leg., ch. 900, § 2.02, 1993 Tex. Gen. Laws 3707, (current version at TEX. HEALTH & SAFETY CODE ANN. § 481.115(b) (Vernon Supp.1996)).

Although the baggie's contents included both the controlled substance and a bulk-increasing material that the chemist called a cutting agent, the chemist was not required to perform a test to determine how much of the baggie's contents were a controlled substance and how much was some other material. We conclude that after viewing the evidence, any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime Williams was charged with. Because we find that the jury's verdict was not irrational and unsup-

ported by proof beyond a reasonable doubt, we overrule Williams' second point of error.

### The Variance Claim

The contention in the third point of error is that the proof adduced at trial did not match the offense alleged in the indictment. Arguing that intent to deliver a controlled substance is a lesser included offense of delivery of a controlled substance, Williams complains that the State proved that he actually *delivered* a controlled substance, after indicting him only for the lesser offense of *intent* to deliver it. Williams contends that a delivery may be proved by showing either (1) actual delivery, or (2) a constructive transfer, or (3) an offer to sell, and therefore he had no way of anticipating which type delivery the State would prove, which prevented him from preparing an adequate defense. Williams' argument is not persuasive.

The undercover police officer's testimony leads to the inescapable conclusion that Williams possessed and intended to deliver to the officer a controlled substance. That is the offense that Williams was indicted for. Possession of a controlled substance with intent to deliver it was proved by the officer's testimony. The evidence is that Williams offered to sell a controlled substance to the officer for an agreed price, the price was paid, and the substance was delivered by Williams to the officer, whose field test of the substance was positive for methamphetamine or amphetamine. Because Williams did deliver the controlled substance that he had described and priced for the officer, proof of that was simply evidence of how Williams manifested his intent to deliver.

Possession of a controlled substance with intent to deliver it can be inferred from the acts of an accused. *Gonzales v. State*, 638 S.W.2d 41, 43 (Tex.App.—Houston [1st Dist.] 1982, pet. ref'd). Williams was indicted for intent to deliver, and his conduct as described by the officer's testimony demonstrated that Williams had that intent at the time of the offense. There was no variance between the indictment and the proof because the evidence simply proved that Williams was guilty of the offense that he was indicted for.

The third point of error is overruled and the judgment of the trial court is affirmed.