**Daniel Rahim SEXTON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 04–98–00598–CR.**

Court of Appeals of Texas,
San Antonio.

Nov. 24, 1999.

Jesse M. Gamez, Melissa Saldana, Law Offices of Jesse Gamez, Inc., San Antonio, for Appellant.

Barbara Hervey, Asst. Crim. Dist. Atty., San Antonio, for Appellee.

Sitting: TOM RICKHOFF, Justice, CATHERINE STONE, Justice, SARAH B. DUNCAN, Justice.

### DENIAL OF MOTION FOR REHEARING AND REVISED OPINION

Opinion by: SARAH B. DUNCAN, Justice.

We withdraw the opinion issued in this case on August 31, 1999, and substitute the following opinion in its stead. However, we deny Sexton's motion for rehearing and do not modify the judgment issued in this case on August 31, 1999.

Daniel Rahim Sexton was convicted of three counts of aggravated assault with a deadly weapon and sentenced to three fifteen-year terms in prison. Sexton appeals the trial court's judgments, arguing the trial court erred in admitting the testimony of the State's firearms expert because the State failed to demonstrate his testimony was reliable. We disagree.

### FACTUAL AND PROCEDURAL BACKGROUND

Sexton was arrested for the aggravated assault of three young people. The three victims had each been shot while sitting in a car at a stop sign. Police recovered a total of sixteen shell casings at the scene of the crime, including four nine millimeter shell casings. Pursuant to Sexton's arrest, the police searched Sexton's bedroom and discovered twenty-six live nine millimeter cartridges. All of the shell casings were given to Ronald Crumley, a firearm and toolmark examiner with the Bexar County Forensic Science Center, to examine. Crumley concluded all four of the spent shell casings had been fired from the same gun. Crumley further concluded that two of the spent shell casings had been cycled through the same magazine as twelve of the live cartridges and the other two spent shell casings had been cycled through the

same magazine as twelve of the other live cartridges.

Crumley based these latter findings on several theories. The general theory of firearm and toolmark examination is that harder metals leave marks on softer metals when they come into contact with each other. Thus, when a magazine is made of a harder metal than a cartridge, it can leave a mark on the cartridge if the two objects come into contact. One of the areas of possible contact is the magazine's lips, which hold the cartridges at the top of the magazine. According to Crumley, if the lips leave a mark on the cartridge, that mark is individual to the magazine, like a fingerprint. Thus, if sufficient magazine marks are left on a shell casing and a live cartridge, a firearm and toolmark examiner can determine, by looking at the two objects under a comparison microscope, whether they were cycled through the same magazine. In this case, Crumley determined that the shell casings had been cycled through the same magazine or magazines as twenty-four of the live cartridges by examining the magazine marks on both the shell casings and the cartridges under a comparison microscope.

After a pre-trial suppression hearing, the court decided to allow Crumley to testify about his findings. Sexton now appeals, arguing the trial court erred in admitting Crumley's testimony that the nine millimeter shell casings found at the scene were loaded into the same magazine as the live cartridges found in Sexton's bedroom.

### STANDARD OF REVIEW

We review a trial court's admission of evidence under the abuse of discretion standard. *Kelly v. State*, 824 S.W.2d 568, 574 (Tex.Crim.App.1992); *Montgomery v. State*, 810 S.W.2d 372, 390–93 (Tex.Crim. App.1991) (on rehearing). A trial court does not abuse its discretion if its "ruling was at least within the zone of reasonable disagreement." *Montgomery*, 810 S.W.2d at 391. Under this standard, we "view the evidence in the light most favorable to the trial court's ruling," affording almost total deference to findings of historical fact supported by the record. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997). However, when the resolution of the factual issue does not turn upon an evaluation of credibility or demeanor, we review the trial court's determination of the applicable law, as well as its application of the appropriate law to the facts it has found, de novo. *Id.*

### DISCUSSION

■■■■ Sexton argues the State failed to prove, by clear and convincing evidence, that the evidence matching the shell casings with the live cartridges was reliable under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kelly*. To be considered reliable, evidence derived from a scientific theory must satisfy three criteria: "(a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question." *Kelly*, 824 S.W.2d at 573. Among the factors the court may take into account in determining the reliability of scientific evidence are:

(1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the expert(s) testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question.

*Id.* This list of factors is by no means exhaustive, and the ultimate inquiry into reliability is flexible. *See Nenno v. State*,

970 S.W.2d 549, 560–61 (Tex.Crim.App. 1998).

Sexton attacks the State's evidence of the validity of both the underlying theory and the technique used to match the shell casings found at the scene of the crime and the cartridges found in Sexton's bedroom to the same magazine or magazines.

### Qualifications and Experience

Crumley testified he has worked as a firearm and toolmark examiner for over five years. He trained at the Texas Department of Public Safety (DPS) crime lab in Austin for one-and-a-half years. As a part of his DPS training, Crumley learned to identify magazine marks and match cartridges based on these marks. He also attended training programs by the Southwest Institute of Forensic Science and the Association of Firearm and Toolmark Examiners, and he taught courses on toolmark examination at the DPS crime lab, the Houston Police Department, and the University of Texas Police Department. Crumley has also written three articles on firearm and toolmark examination, each published in the Association of Firearm and Toolmark Examiners' Journal. In total, he has testified as a firearm and toolmark expert in almost fifty cases. However, this was the first case in which he examined magazine marks and testified about the results.

### Acceptance by the Scientific Community and Support in Literature

The science of ballistics in general, and specifically the matching of toolmarks, enjoys wide acceptance in the scientific community. Cf. United States v. St. Jean, 1995 WL 106960, *5 (A.F.Ct.Crim.App. 1995), aff'd, 45 M.J. 435 (1996); Colorado v. Genrich, 928 P.2d 799, 802 (Colo.Ct.App. 1996); Prewitt v. Alabama, 460 So.2d 296, 302 (Ala.Crim.App.1984); Collins v. Maryland, 52 Md.App. 186, 447 A.2d 1272, 1283 (1982), aff'd, 296 Md. 670, 464 A.2d 1028 (1983); New York v. Magri, 3 N.Y.2d 562,

170 N.Y.S.2d 335, 147 N.E.2d 728, 730 (1958); Leigh Stephens McCarthy, Comment, Life After Daubert v. Merrell Dow: Maine as a Case Law Laboratory for Evidence Rule 702 Without Frye, 46 ME. L.REV. 285, 318 n. 164 (1994).While Crumley acknowledged he had never matched magazine marks in a case before, he also stated that the practice was not a novel one. He identified three treatises in which magazine marks are mentioned as a way of matching cartridges or shell casings, including Julian S. Hatcher's Textbook of Firearms Investigation, Identification and Evidence, Vincent DiMaio's Gunshot Wounds: Practical Aspects of Firearms, Ballistics and Forensic Techniques, and the Association of Firearm and Toolmark Examiner's training manual. However, Sexton points out that this literature makes only passing reference to magazine marks.

DiMaio acknowledges in his book that "the magazine … may … impart class and individual markings to a cartridge … ." VINCENT DIMAIO, GUNSHOT WOUNDS: PRACTICAL ASPECTS OF FIREARMS, BALLISTICS AND FORENSIC TECHNIQUES 31 (1985). Likewise, Hatcher includes magazine lips among the mechanisms that can leave distinctive marks on shell casings. JULIAN S. HATCHER, FIREARMS INVESTIGATION, IDENTIFICATION AND EVIDENCE flyleaf, 310 (1957) (revision of Hatcher's Textbook of Firearms Investigation, Identification and Evidence, published in 1935). Thus, while the treatises may make only sparse mention of magazine marks, it is clear that the literature supports the theory that a magazine can leave identifiable marks on cartridges and shell casings that can be matched to that magazine.

### Rate of Error

According to Crumley, there is no possibility of error in matching one set of magazine marks to another. Crumley claims the technique is one-hundred percent reliable and never wrong. DiMaio, author of Gunshot Wounds: Practical Aspects of

*Firearms, Ballistics, and Forensic Techniques,* testified that he could not be one hundred percent accurate in matching two cartridge cases based on their magazine markings unless he had the actual magazine. However, as Sexton points out in his brief, DiMaio did not qualify as a firearm and toolmark expert, and his interest in firearms and toolmarks came only by way of hobby. Sexton further argues Crumley's statement that there is "no possibility of error" is a "bald assertion" that is "legally insufficient to support this finding." However, while Crumley's assertion does not conclusively establish the overall reliability of the technique for matching magazine marks, *see Daubert v. Merrell Dow Pharm., Inc.,* 43 F.3d 1311, 1316 (9th Cir.), *cert. denied,* 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995), it provides at least some evidence of the possible rate of error, or lack thereof, in the process. *Cf. Williams v. State,* 936 S.W.2d 399, 402–04 (Tex.App.—Fort Worth 1996, pet. ref'd) (no abuse of discretion in finding scientific evidence reliable even when only evidence of rate of error was expert witness's testimony that " '[t]here's not really that much error' " and the test " 'will either work or it won't' ").

### Other Experts

Crumley further testified he worked under the supervision of Ed Love, who has been a firearm and toolmark examiner for over twenty years. Love made an independent examination of the evidence and agreed with Crumley's findings.

### Clarity of Explanation

At the suppression hearing, Crumley clearly explained the underlying theories—from general ideas on firearm and toolmark identification to specific theories on the distinctive quality of magazine marks—and the technique he used to apply those theories—evaluation of the live cartridges and the spent shell casings under a comparison microscope.

### Conclusion

In light of this evidence, we hold the trial court's decision to admit Crumley's testimony did not fall outside of the zone of reasonable disagreement, and we affirm the trial court's judgment. *See Kelly,* 824 S.W.2d at 573; *Aguilar v. State,* 980 S.W.2d 824, 826–27 (Tex.App.—San Antonio 1998, no pet.); *Williams,* 936 S.W.2d at 402–04.