

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| LUKE MATTHEW SWEETSER, | § | No. 08-22-00192-CR |
| Appellant, | § | Appeal from the |
| v. | § | 350th Judicial District Court |
| THE STATE OF TEXAS, | § | of Taylor County, Texas |
| Appellee. | § | (TC# 14606-D) |

# O P I N I O N

## BACKGROUND

In a single issue, Appellant challenges his conviction of murder on grounds the trial court erroneously admitted testimony in violation of Article 38.35 of the Texas Code of Criminal Procedure. We affirm.

### *Factual Background*

On December 12, 2016, Thomas Niblo was shot in his home in Abilene, Texas.[1] Appellant was married to Thomas's sister, Ellouise; Appellant and Thomas were brothers-in-law. Thomas and Appellant did not have a good relationship and did not get along; the dislike was mutual. The

---

[1] Thomas also went by "Tom."

relationship between Thomas and his sister Ellouise was also strained because Thomas had been named executor of their father's will, who had recently passed in June of that year. Thomas was also the named manager of the family LLC and Ellouise had been "left out in the cold," while Thomas retained control.

**A. The murder**

On the morning of December 12, Thomas's wife, Cheryl Niblo, woke up at around 6:09 a.m. and was in the bathroom taking her morning medication when she heard gunshots. Cheryl fled the house through a door that opened to the backyard and saw a lattice that had been torn down, which indicated to her that an intruder had come up from the creek. Evidence later confirmed the intruder either entered from the creek or exited through the creek. She ran across the street and saw her neighbor taking a walk and used his cell phone to call 911. The 911 call reported shots had been fired at 3774 Woodridge Dr. Cheryl specifically reported someone shot her husband while he was asleep in bed and she had fled her house and gone to a friend's.

Officer Brent Payne of the Abilene Police Department was dispatched to the scene. When he arrived, he parked one house away and Sergeant Smith of the Abilene Police Department arrived soon after. They both walked up to the front door, which was locked, so they made their way down the driveway and entered the house through the door in the driveway that led to the den. Alarm records later showed this same den door opened at 6:06 a.m. and again at 6:13 a.m., confirming this was the door the intruder used to enter and exit in committing the murder.

The officers began to clear the bedrooms of the house, one by one. A third officer, Officer Lazirko, then arrived and joined. Once they approached the hallway leading to the primary bedroom, the officers smelled burnt gunpowder. Upon entering the primary bedroom, the officers saw Thomas on the bed, face up, with very severe injuries, and still connected to his sleep machine.

2

An autopsy of Thomas was later performed, and the medical examiner identified eight gunshot wounds along the face, abdomen, chest, arms, and right thigh and leg. The medical examiner determined the cause of death as multiple gunshot wounds.

The officers noticed kick marks on the center of the primary bathroom door and after trying to open the locked bathroom door, they eventually kicked it down. No one was found inside the bathroom, or anywhere else in the remainder of the house. Once the house was cleared, medical responders were let in.

## B. The investigation

Cheryl was eventually taken to the station to be interviewed. A sample was collected of Cheryl's hands and arms for gunshot residue testing, which came back negative. According to Detective Jeff Cowan, Cheryl remained cooperative and consistent throughout the interview and desperately wanted to find her husband's murderer.

Spent shell casings were found on the floor near the bedroom door entry and one right outside the door on a chair. Abilene Police Department forensic specialist Dianna Arndt photographed the exterior of the house, the neighbor's house, and the creek behind the house. She testified footprints were found in the dirt down the steep incline towards the creek. Detective Cowan testified the footprints appeared fresh. A machete-type knife was found stuffed in the mud next to the creek. The machete was processed for fingerprints, but no prints were found. Male DNA, however, was found on the machete, but it was not matched to Appellant. According to Detective Wilson, this indicated gloves were likely worn. A blue latex glove was found in the driveway of another home located about half a block away, and the owner of that home was adamant the glove had not been there the night before. The boot print on the bathroom door was measured and showed to be from a size thirteen boot; Appellant is a size thirteen.

Lead Detective John Wilson testified it did not appear to be a burglary or robbery as there was no evidence of forced entry and nothing was missing. Detective Wilson agreed and opined it appeared to have been someone familiar with the layout of the home. Cheryl testified that at the time of the murder, the home was keyed the same as her mother-in-law's house, Evelyn Niblo (Mrs. Niblo). The same key opened Mrs. Niblo's house and Thomas's and Cheryl's house.

Bullets were retrieved from Thomas's body by the medical examiner and were sent to Alliance Forensics Laboratory for ballistics testing, along with the .40 caliber shell casings found at the Niblo residence. A .40 caliber Heckler, a Koch P30 handgun found in Thomas's closet, and a .40 caliber Glock handgun found inside a warehouse owned by the Niblo family, were also sent to Alliance Forensics Laboratory for ballistics testing. The handguns did not show a positive match for the murder weapon. A bag that contained knives, machetes, and axes was also found in the warehouse.

### C. Appellant as a suspect

Appellant quickly became a person of interest. Appellant had been involved in arguments over family estates and was in financial trouble at the time of the murder. After the murder, he went missing and did not show up to work. Appellant's co-worker, Chris Tucker, testified Appellant was usually early for work and had never missed a day, but on December 12, Appellant did not arrive to work until lunchtime, then left soon after. Later, upon hearing of Thomas's death, Tucker offered his condolences to Appellant, and Appellant responded he and Thomas did not get along and told Tucker that Thomas had called his special needs son a "retard." Tucker testified he found Appellant's reaction to the murder "odd."

Authorities later confirmed Appellant had access to Thomas's house; Appellant had his mother-in-law's spare key that opened Thomas and Cheryl's house. As lead of the murder

4

investigation, Detective Wilson testified that through his investigation, he learned money was very important to Appellant. Detective Wilson reviewed financial records of the Sweetsers and identified fluctuations in their finances. Appellant and Thomas "had issues," which according to Detective Wilson, further established Appellant's motive. By the amount of blood at the scene and the number of times Thomas was shot, Detective Wilson believed this was a "brutal murder" committed by someone who hated Thomas. Detective Wilson learned that Thomas and Ellouise's father (Mr. Niblo), financially provided for Ellouise and Appellant during his lifetime, but that financial help stopped after Mr. Niblo's death. Detective Wilson testified that when Mr. Niblo died, "that left Tom in charge. When [Thomas] was murdered, that left [Mrs. Niblo] in charge. So, [Thomas] was a voting member of a lot of the estate. So, that increased votes that would lead [Appellant and Ellouise] to profit from his murder." Through his investigation, Detective Wilson learned Ellouise was "desperately" trying to get the will changed to benefit her and Appellant, and "one of the things that was in the way was Tom."

A search warrant was obtained for Appellant's phone. The cell phone records showed Appellant's phone was off during the time of the murder and when it was powered back on, Appellant was located near the warehouse area, which is what prompted the authorities to search the warehouse.

The day after the murder, Detective Mike Scott went to Craig Middle School and ATEMS School knowing Appellant would be picking up his children. He asked Appellant if he would go down to the police station to talk; Appellant refused. Ellouise also refused to cooperate with authorities. On the day of the murder, Detective Frank Shoemaker and Detective Wilson asked Ellouise to come down to the police station and she declined. Ellouise did not speak to the police for about the first 120 days after the murder. Then, Detective Wilson finally spoke to Ellouise

5

when Appellant moved out of the house. After, Ellouise spoke to Detective Wilson several times, especially about Appellant's journals. According to Detective Wilson, the more he talked to Ellouise the more it seemed that she realized Appellant did it.

A journal was found in Appellant's nightstand and was identified by Ellouise as belonging to Appellant. The journals discussed plans of attaining wealth, which Appellant evaluated extensively in his journal.

Mrs. Niblo also testified at trial. She shared that after her husband's death, Thomas was given a managing role in the family LLC, which did not sit well with Ellouise. Ellouise felt she and Thomas should have had equal control. Mrs. Niblo learned that Ellouise had $50,000 in credit card debt and after Mr. Niblo's death, Ellouise asked Mrs. Niblo for $250,000; Mrs. Niblo gave her $100,000. During Thanksgiving, the family had a meeting and Ellouise wanted to change the LLC so that she would have a parity in the management. Mrs. Niblo testified the relationship between Ellouise and Thomas had been adversarial since the reading of their father's will.

On the morning of December 12, before Mrs. Niblo learned of her son's death, Ellouise called her asking if she had heard from Appellant. According to Ellouise, Appellant had been out all night and did not know where he was.

Mrs. Niblo also confirmed her house was keyed the same as Thomas's and when asked if Appellant knew where the key was, Mrs. Niblo testified:

> Q: Okay. Now, again, we're talking prior to Thomas' death. Was there a time where your house and your son's house were keyed the same, the same key would work in both houses?
>
> A: That's correct. Tom thought it made it easier to not have to carry so many keys.
>
> Q: And at any point in time, did Luke Sweetser have access to your key?

A: I showed him where I had a hideout key on a lamp above the front door.

.   .   .

Q: And where did you -- where was the hideaway place? Where did you hide the key?

A: Well, it was a very tall lamp on the -- there are two lamps on either side of the front door and you can reach about that high and you can reach it. And I showed Luke where it was, and he felt up there and felt it. And that's all I know. . . .

Q: Okay.

A: I told him that the house was keyed the same as Tom's at that time.

Q: Okay. So, you showed him where your key was; and you also told him that Tom's house was keyed the same.

A: Exactly.

Q: Now, when the police came and talked to you on December the 12th the day you learned that Thomas had been murdered, did you look for that key, around then or soon after?

A: I just can't remember.

Q: Was the key missing when you looked for it?

A: I think so, yeah.

At the time of trial, the key was missing and had not since been found or returned.

A forensic exam of electronic devices Appellant had access to was conducted by Sergeant Chris Milliorn. In searching the devices, a software program called Forensic Toolkit was employed, which consists of connecting the software to the hard drive of the device. The software allows a user to enter search keywords relevant to a criminal investigation and the software then conducts a search of the keywords and returns all relevant information, which could include

7

emails, internet searches, documents, hyperlinks, anything that contains the keyword. Several incriminating target items were bookmarked as relevant to the investigation.

### D. Alleged murder weapon discovered

Almost two years after the murder, a twelve-year-old boy found a gun while playing in the backyard of his grandparent's home, which sloped down the same creek that runs behind the Niblo residence. The gun was very muddy, did not contain a magazine, and was found in a location that would usually be underwater. It was located 880 feet from the Niblo residence. The boy's grandfather notified the Abilene Police Department and turned the gun over to them.

The gun was a Glock Model 22, .40 caliber pistol. Special Agent Dale Watson of the Bureau of Alcohol, Tobacco, Firearms and Explosives submitted a firearms trace for the gun. The database revealed the gun was purchased by Appellant on August 19, 2000. There was no record of the gun being sold or lost since the purchase date. The gun was inoperable and a test fire was not performed due to the presence of rust.

Jeff Goudeau (Goudeau), a firearms expert from the Louisiana State Crime Lab, soaked the gun in rust removal and it was eventually made operable to conduct test fires. The cartridges and test fires were given to forensic firearm and toolmark examiner, Richard Ernest (Ernest).

At trial, an expert witness hearing of Richard Ernest was conducted outside the presence of the jury. Ernest testified he owned Alliance Forensic Laboratory and had 45 years of experience in firearm and toolmark identification testing. He began his career in 1977 at the Georgia State Crime Lab in Atlanta, where he received training in gunshot residue examinations, crime scene examinations, and trace evidence exams. In 1990, Ernest began working cases for the Abilene Police Department, among other departments in Texas, which he did until January of 2020. Ernest has testified in Abilene "[d]ozens upon dozens of times."

8

When asked whether he was retired, Ernest responded he was "semiretired." He explained that in January of 2020, he told the Texas Forensic Science Commission (the Commission) he was not going to go "re-up" on the accreditation process and voluntarily gave them his license and stopped working criminal cases in Texas. The following line of questioning regarding accreditation of his lab, Alliance Forensic Laboratory, occurred:

> Q: And when you stopped -- well, let me ask you this. Prior to that January, 2020, was Alliance Forensic Laboratory an accredited laboratory by the Texas Forensic Science Commission?
>
> A. Yes.
>
> Q. And were you a licensed analyst?
>
> A. Yes.
>
> Q. And when you told them that in January of 2020, did you have open cases that you were still working at that time?
>
> A. Yes, many of them. And I discussed this with them at length. I said, I'm turning in my license and I'm not going to do any further cases in Texas, but what about the cases that I've already worked on. And they said, it's fine for you to close those out; you can testify on those, but not any new cases.
>
> Q. And, so, was that -- would that include the Niblo murder investigation that occurred here in Abilene on 12-12 of 2016?
>
> A. Yes, it would.
>
> Q. Had you done some examinations of several firearms and casings in regards to that case?
>
> A. Yes, quite a number of different firearms were sent to me to compare those against the fired cartridge cases from the scene and bullets from the scene.
>
> Q. And at the time of your retirement, had there been a murder weapon, so to speak, found at that time?
>
> A. No.

Ernest was then asked if there is a way to determine whether a bullet or cartridge case has been fired from a particular gun, and he was asked to explain the class characteristics of doing so. To summarize, Ernest responded that one might not be able to determine what *particular* gun, but rather, what *type* or *brand* of gun. He then testified as to the testing he conducted on the spent bullets recovered from Thomas's body, the gun found in the creek, and the test fires. As to the gun found in the creek—the alleged murder weapon—Ernest testified Sergeant Ford and District Attorney Jim Hicks informed him that Goudeau has been able to match cartridge cases back to the gun, which shocked Ernest. Ernest then reviewed Goudeau's notes, photographs, and reports in conducting his own examination of the test fires and casings. Ernest testified to his findings:

A.  [t]he fired cartridge cases that came from the scene, those can be matched to each other. They have the obvious characteristics of being fired from a Glock. And then, further, the test firings that were fired through this particular pistol by Mr. Goudeau do, in fact, match those cartridge cases, particularly in certain areas of the breech face that was still left intact after this wonderful chemical that he used named Evapo-Rust had basically melted all of the rust away and left the uncorroded surfaces as if they were new. And, so, then he was able to -- he was able to test-fire this particular gun, collect those test-fired cartridge cases. And I looked at those cartridge cases under the comparison microscope and was able to match the cartridge cases from the scene back to the cartridge cases fired from this gun.

Q.  Do you have an opinion, are those -- did that firearm, State's Exhibit 336, fire the cartridges that were left at the murder scene?

A.  Yes.

On cross examination, Ernest was asked the following:

Q.  The work you did on this case, was it under the auspices of Alliance Forensics Laboratory?

A.  Yes.

Q.  Do you have any proof in the way of written documentation or anything else that Alliance Forensics Laboratory was accredited?

10

A.    Well, for several years I [was] listed on their website as an accredited facility. So, I'm sure those records exist. They don't give you a plaque or anything.

Q.    At what point in time did this weapon, the one we see a picture of, whatever exhibit number it is, when was it first delivered to you?

A.    I think I've already testified to that, but the date that it came in to me was August the 12th of 2018.

Q.    At that point in time, did you hold a license from the Texas Commission on Forensic Sciences?

A.    Correct. I did.

Q.    Do you have proof of that?

A.    Well, license. You go back – there's two different things. They didn't actually start the licensing up to a certain point. They simply accredited you and said you were an accredited laboratory. Then they came up with their own licensing program, which is a separate entity. You have to –

Q.    Is that when you became licensed December 20, 2018?

A.    Correct.

Q.    So, August the 12th, 2018, when you got the gun, first got the gun in question, you did not hold a license from the commission.

A.    There was no license.

Q.    All right. Was Alliance Forensics Laboratory accredited?

A.    It was.

Q.    By the commission?

A.    Yes.

.    .    .

Q.    Okay. So, in August of 2018, then, you did what you could with the gun; and then I think you said sometime after that you gave it back to Detective Cowan because you couldn't do anything with it.

11

A.     Correct.

Q.     Then when did you next receive possession of that weapon?

A.     The next time that I saw that weapon was September the 4th of 2020.

Q.     Did you at that time hold a license from the commission, or had your license already expired in December of 2019?

A.     Well, you go back to that; but I -- I held the license and voluntarily surrendered it to the Texas Forensics Science Commission in January of 2020. At that point I was no longer licensed.

Q.     So, September the 4th, 2020, you were not licensed.

A.     Correct.

Q.     And did the examination that you did at that time under the auspices of Alliances Forensics Laboratory.

A.     Correct.

Q.     Was it accredited?

A.     Not at that point.

Q.     Now, in September of 2020 when the gun was -- you received the gun back having had it previously in 2018, what did you do with it?

A.     I did my microscopic examinations of the test firings produced by Mr. Goudeau against the evidence cartridge cases from the scene.

.     .     .

Q.     Did you issue a report regarding your findings?

.     .     .

A.     Yes.

Q.     What's the date of that report?

A.     The date of that report -- it was here recently. August the 23rd of 2022.

On redirect, the State clarified:

Q. Mr. Ernest, at the time that you made the examination in 2020, August of 2020 -- is that right?

A. September the 4th of 2020.

Q. -- September of 2020, you were acting under the information you had received from the Science Commission that you could continue to work your open cases.

A. Correct.

Q. Did you -- who did you speak to at the commission? Do you know?

A. The -- if memory serves me correctly, I discussed that with counsel for the Texas Forensic Science Commission, a Lynn Garcia.

Q. And did you ask for something in writing regarding that? This was on the phone, I guess.

A. Since she basically – she's the one that would make such a determination and she had told me that I could go ahead and work the cases or testify on the cases that I had worked, I took her at her word.

Q. Okay. And that's certainly what you are providing to the Court here today. That's what your testimony is, under that information you received from the commission –

A. Correct.

At the conclusion of the expert witness hearing, the defense objected that Ernest's testimony violated Article 38.35 of the Texas Code of Criminal Procedure because there was no showing that either Ernest or Alliance Forensics Laboratory, were accredited by the Texas Commission on Forensic Sciences. The State relied on the Commission's verbal approval to continue working on his open cases. The trial court ultimately ruled:

[I] find that the State has not violated any discovery rules or requirements with regard to this subject matter that we're discussing right now. Further, based on the evidence that I've heard in this hearing outside the presence of the jury, based on Mr. Ernest's education, training, and experience, I find that he is qualified to give expert opinions in this case and he's qualified to give in front of the jury all of the

13

opinions that he gave to the Court in this hearing outside the presence of the jury. And, so, those are my findings and those are my orders. [The defense's] objections are overruled.

### *Procedural Background*

Appellant was charged by indictment for murder. TEX. PEN. CODE ANN. § 19.02(c). A jury trial began on August 22, 2022. On September 1, 2022, the jury found Appellant guilty and assessed his punishment at confinement by the Texas Department of Criminal Justice Institutional Division for life, and a fine of $10,000. Appellant filed a motion for new trial. This appeal followed.[2]

## DISCUSSION

In a single issue, Appellant maintains the trial court abused its discretion by allowing the trial testimony of Ernest because the Alliance Forensics Laboratory, which is where the forensic testing occurred, was not an accredited laboratory at the time of testing.

### *Standard of Review*

We review a trial court's ruling on the admission of evidence for an abuse of discretion. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). Abuse of discretion occurs when the trial court acts without reference to any guiding principles, acts arbitrarily or unreasonably, or its decision lies outside the zone of reasonable disagreement. *Id*; *White v. State*, Nos. 2-07-089-CR & 2-07-090-CR, 2008 WL 2229636, at *2 (Tex. App.—Fort Worth May 29, 2008, pet. ref'd) (mem. op.). A trial court's ruling on the admission of evidence is afforded wide discretion, and reversal is warranted only if there is a showing of a clear abuse of discretion. *White*, 2008 WL 2229636, at *2.

---

[2] This case was transferred from our sister court in Taylor County, Texas pursuant to the Texas Supreme Court's docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001. We follow the precedent of the Eleventh Court of Appeals to the extent it might conflict with our own. *See* TEX. R. APP. P. 41.3.

*Applicable Law*

This case involves the application of Article 38.35 of the Texas Code of Criminal Procedure, which makes the admissibility of certain forensic evidence contingent on whether the analysis of the evidence was conducted at an accredited laboratory at the time of analysis. TEX. CODE CRIM. PROC. ANN. art. 38.35(a). Article 38.35(d)(1) provides, in relevant part:

> [a] forensic analysis of physical evidence under this article and expert testimony relating to the evidence are not admissible in a criminal action if, at the time of the analysis, the crime laboratory conducting the analysis was not accredited by the [Texas Forensic Commission] under Article 38.01.

*Id*. art. 38.35(d)(1). Forensic analysis includes ballistic expert examination or test performed on physical evidence for the purpose of determining the connection of the evidence to a criminal action. *Id*. art. 38.01(2). Accreditation refers to the specific forensic method or methodology that has been validated or approved by the Texas Forensic Commission. *Id*. art. 38.01(1).

*Analysis*

In a single issue, Appellant maintains the trial court abused its discretion by allowing the testimony of Ernest in violation of Article 38.35(d)(1). Appellant argues that because Ernest testified as to forensic analysis and his testimony was used by the State to establish the gun found in the creek as the murder weapon, the statutory qualification requirements of Article 38.35(d)(1) applied to Ernest and his testimony. We agree.

The only Texas precedent on this very issue was established by our sister court in Texarkana. *See Hargett v. State*, 472 S.W.3d 931, 933 (Tex. App.—Texarkana 2015, no pet.). In *Hargett*, the appellant pled guilty to the offense of driving while intoxicated and was placed on community supervision. *Id*. The State later alleged the appellant violated a term and condition of her community supervision by ingesting methamphetamine and alcohol. *Id*. The trial court found

the State's allegation true, revoked the appellant's community supervision, and sentenced her to imprisonment. *Id*. On appeal, the appellant argued the trial court erred in admitting her drug test results and the accompanying expert testimony in violation of Article 38.35(d)(1) because the laboratory was not accredited at the time of testing. *Id*. The State conceded the lab was not accredited, but argued Article 38.35 is inapplicable to community supervision revocations. *Id*. The Texarkana Court of Appeals rejected this argument, reasoning that because "Article 38.35 defines a criminal action to include 'punishment, or other matter related to conduct proscribed by a criminal offense,'" it applies to community supervision proceedings. *Id*. at 934. The court sustained the appellant's point of error and conducted a harm analysis. *Id.*

The court applied Texas Rule of Appellate Procedure 44.2(b), which requires disregard of the error unless it had a substantial effect or influence on the outcome. *Id*. at 934-95; TEX. R. APP. P. 44.2(b); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). The trial court noted that the State alleged only one violation of community supervision and because the laboratory report and its accompanying expert testimony was the only evidence offered to show a violation of her community supervision, which should have been excluded, the admission of the subject evidence was harmful. *Id*. at 935.

## A. Article 38.35(d)(1)

Our analysis begins with Article 38.35(d)(1) of the Texas Code of Criminal Procedure. It is uncontested that Ernest's forensic analysis and his accompanying testimony was used by the State to establish that the gun found in the creek, which had been purchased by Appellant, was the murder weapon. Accordingly, the statutory qualification requirements of Article 38.35(d)(1) apply to his analysis and testimony.

On appeal, the State emphasizes that Ernest informed the trial court that the Commission verbally told him he was authorized to continue working on his open cases, which according to the State, supports the trial court's ruling. However, the State does not offer precedent in support of its contention that verbal approval suffices, nor are we aware of any.

Article 38.35(d)(1) plainly provides that "forensic analysis of physical evidence" such as ballistic testing, and "expert testimony relating to the evidence[,] are not admissible in a criminal action if, at the time of the analysis, the crime laboratory conducting the analysis was not accredited" by the Commission. TEX. CODE CRIM. PROC. ANN. art. 38.35(d)(1). The Alliance Forensics Laboratory, which is where the testing occurred, was not an accredited laboratory at the time of testing. Ernest confirmed this himself. Accordingly, because the laboratory was not accredited at the time of testing, admission of Ernest's forensic analysis and his accompanying testimony violated Article 38.35(d)(1) and was error.

**B.   44.2(b) harm analysis**

Having found error, we turn to the issue of harm. We apply Texas Rule of Appellate Procedure Rule 44.2(b) in conducting our harm analysis because the erroneous admission of Ernest's forensic analysis and his accompanying testimony was nonconstitutional error. *Hargett*, 472 S.W.3d at 934.

Rule 44.2(b) provides, any "error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." TEX. R. APP. P. 44.2(b). "A substantial right is affected when the error had a substantial, injurious effect or influence on the outcome." *Hargett*, 472 S.W.3d at 934 (citing *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)). Stated differently, a substantial right is not affected by the erroneous admission of evidence if the reviewing court, after an examination of the record as a whole, "has fair assurance that the error

17

did not influence the jury, or had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001).

A reviewing court should consider the record as a whole, including any other admitted testimony or physical evidence, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with the other evidence, the jury's instructions, the parties' theories, and opening and closing arguments. *Sexton v. State*, No. 04-98-00598-CR, 2003 WL 21800084, at *1 (Tex. App.—San Antonio Aug. 6, 2003). Whether the State emphasized the error and whether the contested evidence is cumulative are also factors to consider. *Id*.

To reiterate, in *Hargett*, the Texarkana Court of Appeals found substantial error because the State alleged only one violation of the terms and conditions of community supervision and because the laboratory report and its accompanying expert testimony was the only evidence offered to show such violation, which should have been excluded, the admission of the subject evidence was harmful. *Hargett*, 472 S.W.3d at 935.

Similarly, the San Antonio Court of Appeals also found substantial error in *Sexton v. State*, 2003 WL 21800084, at *1. In *Sexton*, the appellant was convicted of aggravated assault and at trial, an expert witness testified that cartridge cases from bullets found in the appellant's apartment matched fired cartridge cases found at the scene. *Id*. at *1. On appeal, the appellant argued the State failed to show the expert testimony was sufficiently reliable under *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992); the San Antonio Court of Appeals disagreed and held the trial court did not abuse its discretion in allowing the testimony. *Id*. (citing *Sexton v. State*, 12 S.W.3d 517, 521 (Tex. App.—San Antonio 1999, pet. granted). The Court of Criminal Appeals granted review and reversed and remanded for a harm analysis under Texas Rule of Appellate Procedure 44.2(b).

18

*Id*. On remand, the San Antonio Court of Appeals held the error in admitting the expert testimony was harmful and required a new trial. *Sexton*, 2003 WL 21800084, at *1. The court held it could not conclude the error in admitting the contested evidence was harmless because it was the only evidence linking the appellant to the assault, and the State emphasized the "definitive nature" of the contested evidence in opening and closing arguments. *Id*. at *1-2.

However, unlike in *Hargett and Sexton*, the contested evidence and testimony here is not the only evidence linking Appellant to the murder. By our careful examination of the record as a whole, we find there is other overwhelming evidence to support Appellant's conviction.

Testimony was presented that Thomas and Appellant "had issues" and the dislike was mutual. Testimony also established that Thomas had been named executor of his father's will and was also the named manager of the family LLC, while Appellant and Ellouise had been "left out in the cold." Ellouise and Appellant felt Ellouise should have had equal control. There was also evidence of the Sweetsers' financial struggles, and Ellouise's attempts to gain control in the family LLC and have the will changed.

Leading to the murder, Appellant had been involved in arguments over family estate matters and was struggling financially. The night before the murder, Appellant's whereabouts were unknown. After the murder, Appellant's whereabouts were still unknown, and Appellant did not show up to work and refused to go to the police station when he was asked by police officers. Ellouise also refused to cooperate with authorities for the first 120 days after the murder.

A search warrant was later obtained for Appellant's phone and the cell phone records showed that Appellant's phone was off before the murder and during the time of the murder, and when it was powered back on, Appellant was located near the warehouse area, which is what prompted the search of the warehouse. A bag that contained knives, machetes, and axes was also

found in the warehouse. There was also evidence of Appellant's unexplained activity at the same den door the intruder entered at the Niblo residence just ten days before the murder. Google GPS data from Appellant's phone showed he was at the Niblo residence when the Niblos were out of town on December 2, 2016; Appellant was at the side door where the intruder later entered, and he also went down to the creek where the intruder came and left.

Appellant's journal entries, which we find to be particularly incriminating, were also admitted into evidence, some of which read:

- September 17, 2012: "The last 60 days have been a burning hell, the reality of Ellouise and my relationship. I can shut off my empathy system and kill. Serial killer/psychopaths not only don't care for others, ironically they don't care for themselves. Been with the wife for 72 hours and losing my mind already."

- November 14, 2016: "Ways out of hell, how else, facilitate the inheritance shift with Evelyn's death or Syd's death."

- November 20, 2016: "So, it's Sunday; and I'm hating myself. Life f*cking sucks. Sh*t. So, I don't know what to do other than update my WPS/PPP."

- No date: "Everything ends tonight. All debts paid. All accounts closed. Tonight is the end of someone's world. If it's mine, it's going to be messy."

- No date: "Besides there are worse things than being a killer. What about, thou shall not kill? What about the Egyptian Army? Moses drowned when he closed the Red Sea on them. Do you think he could have turned them around with kind words -- works? Sorry. Do you want to know the difference between a killer and a murderer? It's where and why you aim the gun."

20

Testimony revealed Appellant had access to his mother-in-law's spare key, which also opened the Niblo's residence. That key went missing and at the time of trial, it had not been found or returned. The muddy boot print on the bathroom door inside Thomas's bedroom was measured to be from a size thirteen boot; Appellant is a size thirteen.

FBI digital forensics examiner Hazem Naguib testified to the information he downloaded from the electronic devices Appellant had access to. The following was found:

- An email received by Appellant on the day of the murder regarding "Arrest Insurance – Legal Liability Protection."

- An email sent by Appellant the day after the murder, which read: "Hi, Mike: I don't believe the annual premium will create a problem. My brother-in-law (who lives a couple blocks away from me) was brutally murdered yesterday by home invaders and I spent the day with the Abilene Police Department. I'm going downtown this afternoon for questioning so I'll be out of pocket. His body was taken to Fort Worth for autopsy and I don't know when the funeral is going to be. Regardless, while I'm sad for my wife's loss, my brother-in-law and I weren't close so I don't expect it to upset my business schedule too drastically. I look forward to seeing you at Satori in Dallas on Thursday. Go well, Luke."[3]

- Several emails sent by Appellant on the day of the murder regarding the Niblo Trust and Niblo Family Partnership.

- A Google Chrome search made my Appellant on December 11, 2016, which read: "if member dies."

- An email containing the phrase: "Tom called autistic son a retard."

---

[3] Appellant did not go to the police station for questioning this day.

21

- A PowerPoint document titled: "What makes serial killers tick."

- Internet hits for Ontario Knife Company, the same company that manufactured the machete found by the creek at the murder scene.

- An order on Amazon for an item from the Ontario Knife Company, the same company that manufactured the machete found by the creek at the murder scene.

- Email and receipts from a knife company called BUDK showing Appellant had purchased machetes and other knives.

- An email from Appellant dated November 20, 2012 which read: "As my twitter handle says: 'When I die, it's going to be with a machete in one hand, a M-16 in the other and taking down as many ZOMBIES as I can!'"

- Emails between Appellant, Ellouise, and attorneys regarding the dispute about the LLC, partnership and plans for the family ranch.

- An email chain between Thomas and Ellouise in which Thomas apologizes for what he said at the Thanksgiving meeting, to which Ellouise responded: "[I] know the best path would be for all three of us to be able to sign checks/paperwork for the FLP & ranch. Since you, Baba and I all have an interest, all three of us need to be involved in decisions that affect them. That way no one can second guess or feel left out. We just need to be able to be a part. It's Important to act before the end of the year because probate/estate deadlines are coming on, and that stuff will for sure involve the Partnership and the ranch."

- An email sent by Appellant to Ellouise complimenting her on the email she sent to the law firm they were consulting regarding the Niblo Partnership.

- A lengthy history of the Niblo family estate sent by email or dropbox shortly before the murder by Ellouise and Appellant to a Dallas attorney describing their conflicts with Thomas and their desires and plans for the ranch, LLC, and partnership.

- A 2013 email in which Appellant states: "Hmmm. You must be watching *The Walking Dead*……the hero/sheriff/leader/main character —Rick—carries a Colt Python. I'm thinking my Glock 23 [a .40 caliber Glock model] with a couple of my 31 round mags is what I would want to be carrying as a side arm in the Zombie Apocalypse[.] Has a little more umphh than a wimpy 9mm and I'm way more accurate with my .40 than my Glock .45 if I need to be making head shots. Also, as you know, when the shit hits the fan, most specialists will take a single action over a double every time."

- Voicemail recordings and texts found in Appellant's phone between Appellant and Ellouise in which Ellouise states: "Tom was never going to agree to making her the co-manager while he was alive," discussion on how to break up the family partnership, and discussion of a meeting with an accountant to see how much money Mrs. Niblo could pay Ellouise regularly, which they hoped would be $200,000.

- Google GPS data from Appellant's phone showing he was at the side door of the Niblo's house at 3774 Woodridge for three minutes beginning at 5:59 p.m. on December 2, 2016 when the Niblos were out of town. His location was also shown moving down to the creek during that time.

- Call records from Ellouise's phone showing that between 7:12 a.m. and 10:09 a.m. on December 12, she called Appellant ten times.

- A handwritten letter written by Appellant to Ellouise sent via text photo on January 8, 2017, that read: "Make sure you and your mother vote yourself as GP managers of the GP, Niblo

23

Management, LLC. Evelyn might have to bully Elizabeth if Elizabeth is stepping into Tom's shoes. It should be Cheryl running things anyway from my little understanding of estate law."

- Google searches made and websites visited by Appellant in November and December 2016 for firearms websites, "LawyerRatingz" (the name of the defense attorney he would later hire to represent him at trial), and the following searches: "conflict Texas will and LLC"; "what percentage of murders are caused by men"; "gifting of real property before death and estate taxes"; "addiction in a nutshell"; "hydrochloric acid for dead bodies"; "Niblo FLP 2008"; "estate tax exemption for 2016"; "what is a testamentary trust"; "executor of estate and limited liability company interest"; "limited liability companies"; "ZT 41 tactical entry tools"; "Waggoner Ranch"; "Sydney Elmo Niblo"; "death of an LLC member"; "what happens to an LLC when a member dies"; "Kroney Rob attorney in Dallas."

- A screenshot of the creek behind the Niblo house that Appellant viewed at 7:03 p.m. on December 10, 2016 (two days before the murder).

Moreover, there was evidence Appellant purchased and owned a number of knives and machetes, and had specifically purchased knives from the "Ontario Knife Company," the same company that manufactured the machete found by the creek at the murder scene.

Although we disagree with the State's characterization that its emphasis of the contested evidence at trial was only "briefly discussed in rebuttal in response to Appellant's counsel's attack on his credibility[,]" we find this factor circumvented in light of the other evidence supporting Appellant's conviction; particularly, the following evidence.

The alleged murder weapon was a Glock Model 22, .40 caliber pistol. There was testimony Appellant was familiar with guns, enjoyed them very much, and owned several guns. At the time

of trial, he owned a Glock .40 caliber pistol, the very one found in the creek. Irrespective of the admission of Ernest's findings and testimony in violation of Article 35.38, it was revealed through the testimony of Special ATF Agent Watson that the Glock .40 caliber found in the creek was purchased by Appellant in 2000. There were no records indicating it had been purchased by anyone else after that. We find this evidence strongly supports Appellant's conviction.

In sum, we find the other evidence supporting Appellant's guilt overwhelming. After an examination of the record as a whole, we have fair assurance the error did not influence the jury, or had but a slight effect. *See Hargett*, 472 S.W.3d at 934. Accordingly, we conclude Appellant's substantial rights were not infringed as to warrant reversal, and error in admitting the challenged testimony was harmless. Appellant's sole issue is overruled.

## CONCLUSION

For these reasons, we affirm.

YVONNE T. RODRIGUEZ, Chief Justice

August 1, 2023

Before Rodriguez, C.J., Palafox, and Soto, JJ.

(Do Not Publish)